770 So.2d 1119 (2000)
Billy Leon KEARSE, Appellant,
v.
STATE of Florida, Appellee.
No. SC90310.
Supreme Court of Florida.
June 29, 2000.
Rehearing Denied August 24, 2000.
*1122 Richard L. Jorandby, Public Defender, and Jeffrey L. Anderson, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Sara D. Baggett, Assistant Attorney General, West Palm Beach, Florida, for Appellee.
PER CURIAM.
Billy Leon Kearse appeals the imposition of the death penalty upon resentencing. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the death sentence.
Kearse was convicted of robbery with a firearm and first-degree murder for the shooting of Fort Pierce police officer Danny Parrish. The facts surrounding this crime are discussed in Kearse v. State, 662 So.2d 677, 680 (Fla.1995). Following the jury's recommendation, the judge sentenced Kearse to death for the first-degree murder. On appeal, this Court affirmed the convictions but vacated the death sentence and remanded for resentencing because a number of errors occurred during the penalty phase of the trial. See id. at 685-86. This Court concluded that the trial court improperly doubled the "avoid arrest/hinder enforcement of laws" and *1123 "murder of a law enforcement officer" aggravating circumstances, erred in denying Kearse's request for an expanded instruction on the cold, calculated, and premeditated aggravating circumstance, and erroneously applied the heinous, atrocious, or cruel aggravating circumstance. See id. Consequently, this Court vacated Kearse's death sentence and remanded to the trial court for a new penalty phase proceeding before a jury. See id. at 686.
The case was remanded to St. Lucie County, where the offense occurred, and pretrial hearings were conducted there. However, because venue had been changed to Indian River County in the original trial, the penalty proceeding was conducted there. The jury unanimously recommended that Kearse be sentenced to death; the trial court followed that recommendation and imposed the death sentence. The trial court found two aggravating circumstances: the murder was committed during a robbery; and the murder was committed to avoid arrest and hinder law enforcement and the victim was law enforcement officer engaged in performance of his official duties (merged into one factor). The court found age to be a statutory mitigating circumstance and gave it "some but not much weight." Of the forty possible nonstatutory mitigating factors urged by defense counsel, the court found the following to be established: Kearse exhibited acceptable behavior at trial; he had a difficult childhood and this resulted in psychological and emotional problems. The court determined that the mitigating circumstances, neither individually nor collectively, were "substantial or sufficient to outweigh the aggravating circumstances."
On appeal to this Court, Kearse raises twenty-two issues as error: (1) the trial court's refusal to return venue to the county where the offense occurred; (2) the denial of Kearse's objection to a motion to comply with a mental health examination; (3) the denial of Kearse's motion for a continuance; (4) the proportionality of the death penalty; (5) the trial court's evaluation of the mitigating circumstances in the sentencing order; (6) the trial court's failure to evaluate the nonstatutory mitigating circumstance of emotional or mental disturbance; (7) the denial of Kearse's motion to disqualify the prosecutor; (8) the denial of Kearse's motion for a mistrial based on the prosecutor's comments during argument; (9) the trial court informed the jury that Kearse had been found guilty in a previous proceeding, but that the appellate court had remanded the case for resentencing; (10) the denial of Kearse's motion to interview jurors in order to determine juror misconduct; (11) pretrial conferences were conducted during Kearse's involuntary absence; (12) the granting of the State's cause challenge to Juror Jeremy over Kearse's objection; (13) the denial of Kearse's cause challenges to Jurors Barker and Foxwell; (14) Kearse's compelled mental health examination constituted an unconstitutional one-sided rule of discovery; (15) the compelled mental health examination violated the ex post facto clauses of the United States and Florida Constitutions; (16) the compelled mental health examination violated Kearse's Fifth, Sixth, Eighth, and Fourteenth Amendment rights; (17) the victim impact jury instruction was vague and gave undue importance to victim impact evidence; (18) the trial court gave little weight to Kearse's age as a mitigating circumstance; (19) the trial court should have merged the "committed during a robbery" aggravating circumstance with the other aggravators; (20) the trial court should not have considered the "committed during a robbery" aggravating circumstance; (21) the admission of photographs of the victim; and (22) electrocution is cruel and unusual punishment.
In his first issue, Kearse contends that the trial court erred by not permitting him to withdraw his waiver of venue. The shooting of Officer Parrish occurred in St. Lucie County. Kearse moved for a change of venue before his original trial on the basis of pretrial publicity and possible difficulty *1124 in seating an impartial jury. The motion was granted and the first trial was held in Indian River County, which is in the same judicial circuit as St. Lucie County. The judge transferred the case back to St. Lucie County for the sentencing hearing and final sentencing. Thus, Kearse's appeal came to this Court as a conviction from the circuit court in St. Lucie County. Venue was never raised as an issue in Kearse's first appeal and this Court simply remanded to "the trial court with directions to empanel a new jury, to hold a new sentencing proceeding, and to resentence Kearse." Kearse, 662 So.2d at 686. Thus, there was initially some confusion as to which county would be the location for the resentencing. A pretrial conference was conducted by Judge Thomas J. Walsh in St. Lucie County on January 30, 1996. During this hearing, defense counsel moved to change venue back to St. Lucie County, in effect withdrawing Kearse's previous waiver of venue. Initially, the State indicated no opposition to such a change, but the judge deferred consideration of venue until Kearse could be present for the discussion. At a subsequent hearing on February 6, 1996, the State indicated that the proper venue was Indian River County and should not be changed back to St. Lucie County. Kearse personally agreed to the resentencing proceeding being conducted in Indian River County. After Kearse successfully moved to recuse Judge Walsh, however, defense counsel renewed the motion for resentencing to be held in St. Lucie County. Newly appointed Judge C. Pheiffer Trowbridge also deferred consideration of the motion until Kearse could be heard personally. After hearing from all parties and Kearse, the judge denied the motion. The judge noted that all of the reasons for granting the original change of venue (pretrial publicity and possible difficulty in seating an impartial jury) were still factors in the case and that this guided his decision to keep venue in Indian River County.
A motion for a change of venue is addressed to the trial court's discretion and will not be overturned on appeal absent a palpable abuse of discretion. Cole v. State, 701 So.2d 845, 854 (Fla.1997), cert. denied, 523 U.S. 1051, 118 S.Ct. 1370, 140 L.Ed.2d 519 (1998). Given the trial court's articulated reasons for denying a change of venue back to St. Lucie County and Kearse's original request for the change to Indian River County, the denial here cannot be deemed an abuse of discretion and thus we find no merit to this issue.
Kearse also claims that he was involuntarily absent at two pretrial conferences where the venue issue was discussed and that he did not properly waive his presence at pretrial proceedings (claim 11). Florida Rule of Criminal Procedure 3.180(a) states that "the defendant shall be present ... at any pretrial conference, unless waived by the defendant in writing." Because Kearse had not waived his presence at the time of the January 30, 1996, hearing, we find that error occurred. See Pomeranz v. State, 703 So.2d 465, 471 (Fla.1997) (conducting pretrial conferences in defendant's absence without defendant's express waiver was error although defense counsel purported to waive defendant's presence); Coney v. State, 653 So.2d 1009, 1012 (Fla.1995) (same), receded from on other grounds by Boyett v. State, 688 So.2d 308, 310 (Fla.1996).
However, such violations are subject to harmless error analysis and the proceeding will only be reversed on this basis if "fundamental fairness has been thwarted." Pomeranz, 703 So.2d at 471. Here the record reflects that Judge Walsh took the venue issue under advisement and delayed hearing arguments on any motions until Kearse could be present. On February 6, 1996, Kearse filed a written waiver of his presence at all pretrial conferences. At a hearing that same day, Judge Walsh acknowledged the written waiver and informed Kearse that the venue issue would be discussed in his presence. Kearse then personally represented to the court that he *1125 wanted resentencing in Indian River County. Thus, Kearse's absence during the January 30 conference was harmless beyond a reasonable doubt. See id.
On June 21, 1996, after Kearse successfully moved to recuse Judge Walsh from the case, defense counsel renewed the motion for resentencing to be held in St. Lucie County and raised the issue in Kearse's absence. Although defense counsel acknowledged on the record that Kearse had previously filed a waiver of his right to appear at the hearing, Judge Trowbridge took the matter under advisement until Kearse could be heard personally. Because Kearse had waived his presence at pretrial conferences, we conclude that the court did not err in conducting this hearing in Kearse's absence. Furthermore, Kearse was present at the subsequent August 26, 1996, hearing when the parties reargued their positions and the court denied the motion and determined that the resentencing proceeding would remain in Indian River County.
Kearse further contends that he did not validly waive his presence at any pretrial conferences because the court did not conduct a colloquy with him after he filed his written waiver. However, rule 3.180(a)(3) provides that a defendant may waive his or her presence at pretrial conferences by written waiver and does not require the court to conduct a waiver hearing. Thus, Kearse validly waived his presence at pretrial conferences by virtue of his February 6 written waiver.
Issues 2, 14, 15, and 16 all relate to Florida Rule of Criminal Procedure 3.202, which requires the court, in cases where the state seeks the death penalty and where the defendant intends to establish mental mitigation, to order that the defendant be examined by a mental health expert chosen by the state. Rule 3.202 became effective January 1, 1996, but the notice deadlines were revised upon rehearing and the amended rule became effective on May 2, 1996. See Amendments to Fla. Rule of Crim. Pro. 3.220-Discovery, 674 So.2d 83 (Fla.1995).
Kearse claims that the trial court erred in granting the State's motion to compel a mental health examination because the State's notice of intent to seek the death penalty was not timely under rule 3.202 and that the rule is inapplicable to his case, which was remanded for a new sentencing proceeding (issue 2). He further claims that the compelled mental health examination constitutes unconstitutional one-sided discovery (issue 14); that the application of rule 3.202 in his case violates the ex post facto clauses of both the United States and Florida Constitutions (issue 15); and that the introduction of the expert's testimony based upon a defendant's compelled statements violates the defendant's Fifth Amendment privilege against self-incrimination and limits the defendant's ability to present mitigating evidence during the penalty phase (issue 16).
Initially, Kearse contends that the State's notice of intent to seek the death penalty was not timely under the requirements of rule 3.202 and thus the court erred in granting the State's motion to compel a mental health examination. While rule 3.202 became effective January 1, 1996, the rule was amended on rehearing to alter the deadlines for the state's written notice of its intent to seek the death penalty[1] and the defendant's notice of intent to present expert testimony of mental mitigation.[2] As explained in this *1126 Court's opinion on rehearing, "[t]he amendments shall become effective upon the release of this opinion," which was May 2, 1996. Amendments to Fla. Rule of Crim. Pro. 3.220-Discovery, 674 So.2d 83, 85 (Fla.1995). Thus, we agree with the trial court's determination that the parties complied with the applicable time limits and find no merit to issue 2.
Kearse also argues that rule 3.202 is inapplicable to his case (issue 2), violates the ex post facto clauses (issue 15), violates the Fifth Amendment privilege against self-incrimination, and limits the defendant's ability to present mitigating evidence during the penalty phase (issue 16). In Dillbeck v. State, 643 So.2d 1027, 1030 (Fla.1994), this Court authorized a similar procedure to "level the playing field" between the defense and the state. The Court explained that this procedure was necessary in light of its earlier ruling in Nibert v. State, 574 So.2d 1059, 1062 (Fla. 1990), that a trial court must find that a mitigating circumstance has been proved whenever the defense presents a reasonable quantum of competent, uncontroverted evidence of a mitigating circumstance. See Dillbeck, 643 So.2d at 1030. By allowing the state's expert to examine the defendant, the state would have an opportunity to offer meaningful expert testimony to rebut the defense's evidence of mental mitigation. See id. (quoting State v. Hickson, 630 So.2d 172, 176 (Fla.1993)).
In Elledge v. State, 706 So.2d 1340 (Fla. 1997), cert. denied, 525 U.S. 944, 119 S.Ct. 366, 142 L.Ed.2d 303 (1998), the defendant argued that the trial court erred in compelling a similar mental health examination when there was no authority to compel the exam. In that case, rule 3.202 did not become effective until three years after the defendant's resentencing. See id. at 1345. This Court concluded that there was no error because the procedures ordered by the court were "consistent with the requirements set forth in rule 3.220[[3]] and in Dillbeck." Id. We have also concluded that the compelled mental health examination required by rule 3.202 does not violate the Fifth Amendment's proscription against compelled self-incrimination. See Davis v. State, 698 So.2d 1182, 1191 (Fla. 1997), cert. denied, 522 U.S. 1127, 118 S.Ct. 1076, 140 L.Ed.2d 134 (1998); Dillbeck, 643 So.2d at 1030-31. Accordingly, we agree with the trial court's determination that rule 3.202 is applicable to the instant case and find no merit to the remainder of issue 2 and issues 15 and 16.
In issue 14, Kearse argues that rule 3.202 requires the kind of one-sided discovery that the United States Supreme Court deemed unconstitutional in Wardius v. Oregon, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973). We conclude that Wardius is inapposite to the instant case. Wardius involved an Oregon statute that precluded the defendant from introducing alibi evidence where the defense did not provide notice of an alibi defense prior to trial. The United States Supreme Court held that the Oregon statute violated due process because the statute did not specifically grant criminal defendants reciprocal discovery rights. See id. at 472, 93 S.Ct. 2208. The Supreme Court explained that "in the absence of a strong showing of state interests to the contrary, discovery must be a two-way street." Id. at 475, 93 S.Ct. 2208. The Supreme Court concluded that "in the absence of fair notice that [Wardius] would have an opportunity to discover the State's rebuttal witnesses, [he could not] be compelled to reveal his alibi defense." Id. at 479, 93 S.Ct. 2208.
Kearse argues that rule 3.202 is similarly flawed in that it requires a defendant to *1127 give written notice of intent to present expert testimony of mental mitigation, to give a statement of particulars listing the mitigating circumstances the defendant expects to establish through the expert testimony, and to list the names and addresses of the experts who will establish the mitigation, while imposing no corresponding duties on the state. See Fla. R.Crim. P. 3.202(b), (c). While rule 3.202 does not by its terms require reciprocal discovery by the State, rule 3.220 spells out very specific discovery obligations by both sides when the defendant elects to participate in discovery. By rule, Florida provides for two-way discovery and imposes obligations on both parties, including a list of expert witnesses. See Fla. R.Crim. P. 3.220(b)(1)(A)(i). This is unlike the situation in Wardius where Oregon granted no discovery rights to criminal defendants. See 412 U.S. at 475, 93 S.Ct. 2208. Thus, we conclude that rule 3.202 does not violate a defendant's due process rights.
Issue 3 involves the trial court's denial of Kearse's motion for a continuance in order to depose the State's mental health expert witness and research the expert's background in preparation for rebuttal. The trial court conducted two hearings on Kearse's motion for a continuance. The first hearing was held several days before the resentencing proceeding commenced and was conducted by a substitute judge in the trial judge's absence. Before jury selection began Kearse again moved for a continuance and the trial judge heard argument from both sides. The trial court denied the continuance on the expert testimony issue, concluding that rule 3.202 contemplated timely action by the parties without long delays. The court found "no grounds for continuance on the expert testimony issue" and ordered the parties to depose the experts during evenings and weekends to avoid delaying the resentencing proceeding.
The granting of a continuance is within a trial court's discretion, and the court's ruling will only be reversed when an abuse of discretion is shown. See Gorby v. State, 630 So.2d 544, 546 (Fla.1993). An abuse of discretion is generally not found unless the court's ruling on the continuance results in undue prejudice to defendant. See Fennie v. State, 648 So.2d 95, 97 (Fla.1994). This general rule is true even in death penalty cases. "While death penalty cases command [this Court's] closest scrutiny, it is still the obligation of an appellate court to review with caution the exercise of experienced discretion by a trial judge in matters such as a motion for a continuance." Cooper v. State, 336 So.2d 1133, 1138 (Fla.1976); see also Hunter v. State, 660 So.2d 244, 249 (Fla.1995). In the instant case, there is no indication that Kearse was prejudiced by the denial of the continuance. See Hunter. Under these circumstances, the court's denial was not an abuse of discretion.
Claims 10, 12, and 13 involve juror issues. Kearse contends that the court erred in denying his motion to interview the jurors in order to determine whether juror misconduct had occurred (claim 10). Six weeks after the jury had rendered its recommendation that a death sentence be imposed, Kearse filed a motion to interview the jurors. Attached was an affidavit from an assistant public defender who overheard a lunch conversation by several unnamed jurors during the course of the trial. According to the affidavit, one juror stated, "I can't believe that [the defense counsel] said that." Another juror replied, "I watched his facethat was a bad thing." Defense counsel filed the motion more than a month after being informed by the public defender about this overheard conversation. The State filed a response, arguing that the equivocal nature of the comments did not warrant a juror interview. At hearing on this motion, both sides relied upon their written arguments and made no further argument. The court denied the motion.
As explained by this Court in Baptist Hospital v. Maler, 579 So.2d 97, 100 (Fla. 1991), juror interviews are not permissible *1128 unless the moving party has made sworn allegations that, if true, would require the court to order a new trial because the alleged error was so fundamental and prejudicial as to vitiate the entire proceeding. This standard was formulated "in light of the strong public policy against allowing litigants either to harass jurors or to upset a verdict by attempting to ascertain some improper motive underlying it." Id. Kearse's allegations did not meet this standard and thus the court did not err in denying the motion.
Kearse also raises two juror challenge issues: that the court erroneously granted the State's cause challenge of Juror Jeremy (issue 12) and erroneously denied his cause challenges of Jurors Barker and Foxwell (issue 13). The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court. See Lusk v. State, 446 So.2d 1038, 1041 (Fla. 1984). A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind. See Bryant v. State, 656 So.2d 426, 428 (Fla.1995). A trial court has great discretion when deciding whether to grant or deny a challenge for cause based on juror incompetency. See Pentecost v. State, 545 So.2d 861 (Fla.1989). The decision to deny a challenge for cause will be upheld on appeal if there is support in the record for the decision. See Gore v. State, 706 So.2d 1328, 1332 (Fla.1997), cert. denied, 525 U.S. 892, 119 S.Ct. 212, 142 L.Ed.2d 174 (1998). "In reviewing a claim of error such as this, we have recognized that the trial court has a unique vantage point in the determination of juror bias. The trial court is able to see the jurors' voir dire responses and make observations which simply cannot be discerned from an appellate record." Smith v. State, 699 So.2d 629, 635-36 (Fla.1997), cert. denied, 523 U.S. 1008, 118 S.Ct. 1194, 140 L.Ed.2d 323 and cert. denied, 523 U.S. 1020, 118 S.Ct. 1300, 140 L.Ed.2d 466 (1998); see also Taylor v. State, 638 So.2d 30, 32 (Fla. 1994). It is the trial court's duty to determine whether a challenge for cause is proper. See Smith, 699 So.2d at 636.
The trial court's finding that Juror Jeremy's views would have substantially impaired her performance as a juror is adequately supported by the record. Throughout questioning by the State and defense counsel Jeremy stated that her feelings about the death penalty would impair her ability to follow the law and that she just could not see herself voting for death when she knew that a true life sentence was an alternative. Thus, there was no error in dismissing Jeremy for cause.
In claim 13, Kearse contends that Jurors Barker and Foxwell should have been excused for cause. In order to preserve such an issue for appeal, Florida law requires a defendant to object to the jurors, show that he or she has exhausted all peremptory challenges and requested more that were denied, and identify a specific juror that he or she would have excused if possible. See Dillbeck, 643 So.2d at 1028; Trotter v. State, 576 So.2d 691, 693 (Fla.1990). In the instant case, Kearse has properly preserved this issue. Although neither Foxwell nor Barker served on the jury because Kearse struck them peremptorily, Kearse sought additional peremptory challenges after exhausting his allotted number and named two jurors that he would strike with the extra challenges.
However, even though the issue was preserved for appellate review, the record shows that the trial court did not abuse its discretion in refusing to excuse Barker and Foxwell for cause. The voir dire transcript indicates that each met the test of juror competency in that each could "lay aside any bias or prejudice and render his [or her] verdict solely upon the evidence presented and the instructions on the law given to him [or her] by the court." Lusk v. State, 446 So.2d 1038, 1041 (Fla. *1129 1984). Originally, Foxwell expressed his belief in the death penalty and his frustrations with the criminal justice system. However, when the capital sentencing process was explained to him, he unequivocally stated that he would follow the law. Defense counsel challenged Barker because her husband was a retired police officer and because she originally wanted assurances that a life sentence would be a true life sentence and that conjugal visits not be permitted. However, Barker repeatedly stated that her husband's status as a police officer would not influence her in any way. After defense counsel explained that she would not receive any assurances about the nature of a life sentence, she unequivocally stated that she could be fair and impartial and follow the law. Barker was questioned at length by both sides. A review of this questioning supports the court's denial of the cause challenge. The trial court did not abuse its discretion in declining to excuse these challenged venire members. Although they expressed certain biases and prejudices, each of them also stated that they could set aside their personal views and follow the law in light of the evidence presented. Thus, we find no merit to this claim.
Kearse also contends that the court erred in denying his motion to disqualify the prosecutor (claim 7). Kearse moved to disqualify Prosecutor David Morgan because Morgan had been elected county court judge in Indian River County where the resentencing proceeding was to be held. Although Morgan had not yet taken office, Kearse argued that the State would have "an unfair advantage in its attempt to convince the jury that they should impose the death penalty" by being represented by the prosecutor. The court denied the motion, stating that a disqualification on this basis would prohibit all nominated or elected judges who had not taken office yet from practicing law and would also affect retired judges who wanted to practice law. The court also stated that there could not be a blanket assumption that such a person would have an advantage in court and the motion could be reconsidered if any prejudice was revealed during voir dire.
Disqualification of a state attorney is proper only when specific prejudice demonstrated. See Farina v. State, 679 So.2d 1151, 1157 (Fla.1996), receded from on other grounds by Franqui v. State, 699 So.2d 1312, 1320 (Fla.1997); State v. Clausell, 474 So.2d 1189, 1190 (Fla.1985). Furthermore, "[a]ctual prejudice is something more than the mere appearance of impropriety." Meggs v. McClure, 538 So.2d 518, 519 (Fla. 1st DCA 1989). Under this standard, we conclude that the trial court properly denied Kearse's motion to disqualify the prosecutor.
Claim 8 involves comments made by the prosecutor. During opening argument, the prosecutor stated that Kearse "wants to live, even though he denied that right to Officer Parrish" and urged the jury to show "this Defendant the same mercy he showed Officer Parrish." In response, defense counsel moved for a mistrial, which the court denied. The State contends that this issue has not been properly preserved for appeal because counsel simply moved for a mistrial and did not object or ask for a curative instruction. However, as this Court explained in Spencer v. State, 645 So.2d 377, 383 (Fla. 1994), defense counsel may conclude that a curative instruction will not cure the error and choose not to request one. Thus, a defendant need not request a curative instruction in order to preserve an improper comment issue for appeal. Id. Moreover, even though Kearse's counsel did not specifically object to the prosecutor's comment, counsel's contemporaneous motion for mistrial at the time that the prosecutor made these comments was sufficient to preserve the issue for appellate review. See James v. State, 695 So.2d 1229, 1234 (Fla.), cert. denied, 522 U.S. 1000, 118 S.Ct. 569, 139 L.Ed.2d 409 (1997).
*1130 This Court has found similar prosecutorial comments to be error. See Richardson v. State, 604 So.2d 1107, 1109 (Fla. 1992) (finding that prosecutor committed error in asking the jury to show defendant as much pity as he showed his victim); Rhodes v. State, 547 So.2d 1201, 1206 (Fla. 1989) (finding that the prosecutor's argument that jury show defendant same mercy shown to the victim on the day of her death was "an unnecessary appeal to the sympathies of the jurors, calculated to influence their sentence recommendation") However, "prosecutorial error alone does not automatically warrant a mistrial." Rhodes, 547 So.2d at 1206. We must examine the entire record and the nature of the improper comments made. See, e.g., Richardson, 604 So.2d at 1109 (concluding that, in light of the entire record, one comment by the prosecutor was harmless beyond a reasonable doubt); Rhodes, 547 So.2d at 1206 (stating that even though the cumulative effect of the prosecutor's five egregious comments required reversal, "none of these comments standing alone may have been so egregious as to warrant a mistrial"). In light of the record in this case, this single erroneous comment was not so egregious as to require reversal of the entire resentencing proceeding.
Claim 9 and part of claim 8 involve comments and instructions to the jury regarding the nature and reason for the resentencing proceeding. In response to inquiries by the venire members, the trial court explained that Kearse had been found guilty by another jury and that an appellate court had remanded the case for resentencing. The court gave a similar instruction to the jury during the preliminary instructions. Kearse claims that the court erred by informing the jury of his previous conviction (claim 9). He also raises as error the prosecutor's comment that this Court had directed a new proceeding to recommend death (claim 8).
When resentencing a defendant who has previously been sentenced to death, caution should be used in mentioning the defendant's prior sentence. See Hitchcock v. State, 673 So.2d 859, 863 (Fla. 1996). Making the present jury aware that a prior jury recommended death and reemphasizing this fact could have the effect of preconditioning the present jury to a death recommendation. See id. To avoid this potential problem on remand in such cases, this Court approved the following instruction to explain to the jury why it is considering the sentence:
Ladies and gentlemen of the jury, the defendant has been found guilty of Murder in the First Degree. [An appellate court has reviewed and affirmed the defendant's conviction. However, the appellate court sent the case back to this court with instructions that the defendant is to have a new trial to decide what sentence should be imposed.] Consequently, you will not concern yourselves with the question of [his][her] guilt.
Standard Jury Instructions in Criminal Cases No. 96-1, 690 So.2d 1263, 1264 (Fla. 1997). No other instruction is to be given by the court as to a prior jury's penalty-phase verdict or why the case is before the jury for resentencing at this time. See Hitchcock, 673 So.2d at 863. The trial court's instructions in the instant case were consistent with this standard instruction. Thus, we find no instructional error by the court. We further note that defense counsel specifically approved the instruction when initially given to the venire and did not object when it was read a second time when new prospective jurors were included in the venire. Defense counsel again voiced his approval of the instruction which was included in the standard preliminary instructions given to the jury. Thus, even if the instruction had been erroneous, the issue was not properly preserved.
The only real issue here is the prosecutor's comment during jury selection that this Court had affirmed Kearse's conviction, but "said that there should be a proceeding to recommend death." While *1131 this was clearly an erroneous statement by the prosecutor, defense counsel neither objected to the comment nor asked for a curative instruction. Kearse argues that the prosecutor's comment constituted fundamental error which can be reviewed without objection and that no instruction could cure this error. The State contends that the error was cured by the totality of the comments and the court's instructions and that the error did not vitiate the entire resentencing. The record shows that this was an isolated misstatement by the prosecutor and, as explained above, the trial court correctly instructed the jury as to the nature of the resentencing proceeding. Thus, no relief is warranted on this basis.
Kearse claims that the court erred in admitting photographs depicting the victim's wounds and a surgical scar from resuscitation efforts at the hospital and also erred in admitting the medical examiner's testimony detailing the victim's injuries (claim 21). Before the medical examiner testified, defense counsel objected to the medical examiner's testimony, arguing that the victim's injuries were not relevant to any aggravating circumstance that the jury would be instructed on[4] and thus should not be admitted. The State responded that the victim's injuries were relevant to show the resentencing jury the entire context of the homicide so that they would not be making a sentencing recommendation in a vacuum and that the injuries were also relevant to show that a robbery occurred by showing that force was used. The trial court overruled the defense objection to the testimony, but ruled that specific photographs must be proffered for the court's approval. The State limited the photographs to five, half of the number of photographs introduced during Kearse's first trial. Each of the photographs depicted different injuries to the victim.[5] The prosecutor stated that this was the "[f]ewest number of photographs" that the State could find. The medical examiner used these photos to explain the nature of the victim's wounds and the cause of death. The medical examiner testified that nine of the gunshot wounds penetrated the victim's body and four more struck his body but did not penetrate it. He further stated that the victim would have been unable to use his left arm, unable to stand on his left leg, would have been paralyzed by the injuries to his spine, would possibly have been conscious and capable of speech, and that he died from massive internal hemorrhage.
The test for the admission of evidence is relevancy as to the "nature of the crime" and not just as to whether the evidence was admissible to prove any aggravating or mitigating circumstances. See Wike v. State, 698 So.2d 817, 821 (Fla. 1997), cert. denied, 522 U.S. 1058, 118 S.Ct. 714, 139 L.Ed.2d 655 (1998); see also § 921.141(1), Fla. Stat. (1995) (stating that in a capital sentencing proceeding "evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant"). Because this was a resentencing proceeding, the jury initially knew nothing about the facts of the case. See Wike, 698 So.2d at 821. The basic premise of the sentencing procedure is that the sentencer is to consider all relevant evidence regarding the nature of the crime and the character of the defendant to determine the appropriate punishment. See id. Had this been the same jury that *1132 originally determined Kearse's guilt, the jury would have been allowed to hear and see this evidence and more. See id. Kearse's resentencing jury could not be forced to make its sentencing recommendation in a vacuum, and both the photographic evidence and the medical examiner's testimony were relevant to the nature of the crime. See Preston v. State, 607 So.2d 404, 410 (Fla.1992). Moreover, the trial court has discretion to admit relevant photographic evidence, and the fact that photographs are gruesome does not render the admission an abuse of discretion. See id. Accordingly, we find no error in the admission of the photographs or the medical examiner's testimony.
In claim 17, Kearse argues that the trial court erred in giving the jury an instruction on victim impact evidence. According to Kearse, the instruction was vague and thus did not give the jury adequate guidance in how to consider the evidence and also gave undue influence to the victim impact evidence by calling it to the jury's attention. We find no merit to this claim. Defense counsel acknowledged that victim impact evidence was admissible, but argued that the law did not permit any instruction as to the evidence. The State responded that the instruction was necessary to inform the jury that victim impact was not an aggravating circumstance, to guide the jury in its consideration of this evidence, and to prevent the defense from arguing that it was evidence that the State brought in impermissibly. The trial court overruled the defense objection and gave the following instruction:
Now you have heard evidence that concerns the uniqueness of Danny Parrish as an individual human being and the resultant loss to the community's members by the victim's death. Family members are unique to each other by reason of the relationship and role each has in the family. A loss to the family is a loss to both the community of the family and to the larger community outside the family. While such evidence is not to be considered as establishing either an aggravating or mitigating circumstance, you may still consider it as evidence in the case.
Defense counsel did not object to the instruction as a misstatement of the law and offered no alternative to the State's requested instruction. Instead, defense counsel simply argued that no instruction was required. As this Court has repeatedly explained, our approval of standard jury instructions does not relieve a trial judge of his or her responsibility under the law to charge the jury properly and correctly in each case. See, e.g., Standard Jury Instructions in Criminal Cases (95-1), 657 So.2d 1152, 1153 (Fla.1995); In re Use by Trial Courts of Standard Jury Instructions in Criminal Cases, 431 So.2d 594, 598 (Fla.1981). Moreover, this Court's approval of standard instructions does not foreclose parties from "requesting additional or alternative instructions." Standard Jury Instructions In Criminal Cases (97-2), 723 So.2d 123, 123 (Fla.1998). The language of the instruction given here mirrors this Court's explanation of the boundaries of victim impact evidence[6] and the language in the victim impact evidence statute.[7] Moreover, the instruction given *1133 helped to guide the jury's consideration of the victim impact evidence, including that the evidence could not be viewed as an aggravating circumstance. Thus, the court did not err in giving this special instruction.
Claims 5, 6, and 18 involve the trial court's consideration of various mitigating circumstances. Kearse claims that the trial court failed to evaluate the nonstatutory mitigating circumstance of emotional or mental disturbance (claim 6), erred in giving little weight to his age as a mitigating circumstance (claim 18), and did not conduct a proper analysis as to the mitigating circumstances in the sentencing order (claim 5). For the reasons explained below, we find no error in the trial court's consideration of the mitigating circumstances.
Campbell v. State, 571 So.2d 415, 420 (Fla.1990), requires the sentencing court to expressly evaluate in its written order each mitigating circumstance proposed by the defendant. Kearse contends that the sentencing order here only contained a summary analysis of the mitigation and that this lack of detail does not permit this Court to perform a meaningful review of the order (claim 5). In a sentencing memo to the trial court, Kearse's defense counsel listed forty nonstatutory mitigating factors. Kearse claims that the trial court failed to properly analyze items 6 through 39 because each factor was not specifically listed. Instead, the court categorized these factors as relating to Kearse's "difficult childhood and his psychological and emotional condition because of it." Of these factors, the court concluded that all but fetal alcohol effect and organic brain damage were established and entitled to some weight. The court did not abuse its discretion in grouping the nonstatutory mitigating circumstances in this manner. See Reaves v. State, 639 So.2d 1, 6 (Fla.1994) (finding that trial judge reasonably grouped several proffered nonstatutory mitigating factors into three factors).
Kearse also asserts that the trial court failed to evaluate the nonstatutory mitigating circumstances of emotional or mental disturbance (claim 6). The sentencing order explains that the trial court rejected the statutory mental mitigating circumstance because the disturbance was not "extreme." The order discusses the evidence presented and notes that the experts who testified disagreed as to the severity of Kearse's disturbance. Additionally, the sentencing order shows that the court did consider Kearse's mental health evidence as nonstatutory mitigation, found such evidence to exist, and gave each of these nonstatutory factors some weight.
Finally, Kearse claims that the court erred in its evaluation of his age (18 years and 3 months at the time of the shooting) as a mitigator (claim 18). Where a defendant is not a minor, no per se rule exists which pinpoints a particular age as an automatic factor in mitigation. See Shellito v. State, 701 So.2d 837, 843 (Fla. 1997), cert. denied, 523 U.S. 1084, 118 S.Ct. 1537, 140 L.Ed.2d 686 (1998). Instead, the trial judge is to evaluate the defendant's age based on the evidence adduced at trial and at the sentencing hearing. See id. Deciding the weight to be given a mitigating circumstance is within the trial court's discretion, and its decision is subject to the abuse-of-discretion standard. See Cole v. State, 701 So.2d 845, 852 (Fla.1997). This Court has held that the trial judge is in the best position to judge a non-minor defendant's emotional and maturity level, and this Court will not second-guess the judge's decision to accept age in mitigation but assign it only slight weight. See Shellito, 701 So.2d at 844.
Claims 19 and 20 both relate to the trial court's consideration of the "commission during a robbery" aggravating circumstance. *1134 Kearse contends that either the trial court should have merged this factor with the avoid arrest/hinder law enforcement aggravator or should not have found this aggravator established at all. Kearse argues that his case is similar to Jones v. State, 580 So.2d 143, 146 (Fla. 1991), in which this Court concluded that the "committed during a robbery" aggravator could not apply even though the taking of the victim officer's gun may have technically constituted a robbery. We conclude, however, that the instant case is distinguishable from Jones. In Jones, while the taking of the officer's service revolver was "technically an armed robbery, [it] was only incidental to the killing, not the reason for it." 580 So.2d at 146. As noted in our opinion, Jones took the gun and fled after the officer had been fatally wounded in the chest. Id. at 144-45. In the instant case, the evidence shows that Kearse forcibly took the officer's service pistol, turned the weapon on the officer, and then killed him. As noted in the court's sentencing order, "[e]ven though [Kearse] may have been motivated by his desire to avoid arrest when he took the gun, the incident still constituted a robbery under the definition of that offense." However, the trial court gave this aggravator somewhat diminished weight because this was not a planned activity like a holdup. As explained in the sentencing order, Kearse "took the weapon to effect the killing and then kept it to conceal the fingerprints and other evidentiary matters it presented." In light of these circumstances, we conclude that the trial court properly found this aggravator and it does not constitute improper doubling.
Kearse also argues that the death sentence is disproportionate in this case because of the quality of the mitigating and aggravating circumstances (claim 4). "Our proportionality review requires us to `consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.'" Terry v. State, 668 So.2d 954, 965 (Fla.1996) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)).
In the instant case, Kearse claims that the robbery aggravator is so intertwined with the avoid arrest aggravator that these should be considered one aggravator. He also contends that the trial court did not properly weigh the "lifetime of mitigation leading up to this incident." As discussed above, however, the robbery aggravator was properly found in this case and did not constitute doubling. The trial court also considered the various mitigating circumstances urged by Kearse, considered the suggested factors, and gave some weight to them. The court concluded, however, that "the statutory and nonstatutory mitigating circumstances found proven are not individually or in toto substantial or sufficient to outweigh the aggravating circumstances." It is within the sentencing judge's discretion to determine the relative weight given to each established mitigator, and that ruling will not be disturbed if supported by competent, substantial evidence in the record. See Spencer v. State, 691 So.2d 1062, 1064 (Fla.1996); Johnson v. State, 660 So.2d 637, 646 (Fla.1995). Nor does this Court conduct a reweighing of the aggravating and mitigating circumstances. Absent demonstrable legal error, we accept those aggravating factors and mitigating circumstances found by the trial court as the basis for our proportionality review. See State v. Henry, 456 So.2d 466, 469 (Fla. 1984).
Thus, the instant case involves two aggravating factors (committed during a robbery and avoid arrest/hinder law enforcement/murder of a law enforcement officer) and a number of nonstatutory mitigating circumstances and the statutory mitigating circumstance of age. The trial court afforded the mitigating circumstances only "some" or "little" weight. Kearse cites Fitzpatrick v. State, 527 So.2d 809 (Fla.1988), as evidence that the death sentence is disproportionate in his case. *1135 While both cases involved the murder of a law enforcement officer in order to avoid arrest, Fitzpatrick is distinguishable from the instant case. The record in Fitzpatrick supported the trial court's finding of the statutory mitigators of extreme emotional or mental disturbance, substantially impaired capacity to conform his conduct to the requirements of the law, and low emotional age. In addition to eyewitness and family testimony about Fitzpatrick's "psychotic" and "goofy" behavior, several experts testified that Fitzpatrick had an emotional age between nine and twelve years old; a neurologist testified that his examination revealed "extensive brain damage with symptoms resembling schizophrenia"; and all of the experts agreed that Fitzpatrick suffered from "extreme emotional and mental disturbance and that his capacity to conform his conduct to the requirements of the law was substantially impaired." Id. at 811-12. In contrast, in the instant case the trial court found no evidence of organic brain damage and concluded that Kearse "exhibited sophistication rather than naivete." Thus, Kearse's reliance on Fitzpatrick is misplaced.
To the contrary, we find the instant case is comparable to Burns v. State, 699 So.2d 646, 651 (Fla.1997), cert. denied, 522 U.S. 1121, 118 S.Ct. 1063, 140 L.Ed.2d 123 (1998), in which we concluded that the circumstances were "sufficient to support the death penalty." Burns also involved a defendant who murdered a law enforcement officer in order to avoid arrest. As in the instant case, the trial court merged these factors into one aggravator and afforded it great weight. Id. at 650. Also like the instant case, Burns was "devoid of the statutory mental mitigators," and the statutory and nonstatutory mitigators that were found were afforded only "minimal weight." Id. Accordingly, we reject Kearse's contention that his death sentence is disproportionate.
As his final claim, Kearse argues that his death sentence must be vacated because electrocution is cruel and unusual punishment (claim 22). Any question regarding the constitutionality of electrocution has been resolved since Kearse filed this appeal. See ch. 00-2, § 2, Laws of Fla. ("A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution.") (signed into law by the Governor on Jan. 14, 2000); Sims v. State, 754 So.2d 657, 664-65 (Fla. 2000) (holding that the retroactive application of the choice statute did not violate Ex Post Facto clauses of the state and federal constitutions).
For the reasons expressed above, we affirm Kearse's sentence of death.
It is so ordered.
HARDING, C.J., and WELLS, LEWIS and QUINCE, JJ., concur.
ANSTEAD, J., dissents with an opinion, in which SHAW and PARIENTE, JJ., concur.
ANSTEAD, J., dissenting.
I have several concerns with the majority's treatment of the issues, and especially with the conclusion that this is one of the most aggravated and least mitigated murders requiring that the eighteen-year-old defendant be executed.

PROPORTIONALITY
First, and most importantly, I cannot agree that death is the appropriate penalty in this case under the standards for proportionality we have established. In State v. Dixon, 283 So.2d 1, 8 (Fla.1973), we stated that this Court's review process is to ensure that the death penalty is reserved for "the most aggravated, the most indefensible of crimes." We recently reiterated this view in Cooper v. State, 739 So.2d 82 (Fla.1999), wherein we stated that "`[o]ur law reserves the death penalty only for the most aggravated and least mitigated murders.'" Id. at 85 (quoting Almeida v. State, 748 So.2d 922, 933 (Fla.1999) *1136 (quoting Kramer v. State, 619 So.2d 274, 278 (Fla.1993))). Indeed, despite the existence of multiple aggravating factors, we vacated Cooper's sentence of death because upon review of the record, we found that the case was one of the most mitigated killings that we have reviewed. See id. at 86.
Based on the amount of mitigation presented by the defense and accepted by the trial court, and the presence of only one serious aggravator, this case is clearly not one of the most aggravated, least mitigated of first-degree murders. Rather, the killing resulted from the impulsive act of an eighteen-year-old who functions on a low average-borderline intelligence level and has a documented history of emotional problems. Importantly, there is no evidence that Kearse set out that night intending to commit any crime, let alone murder. In fact, he had just picked up a pizza and was returning home to eat it with friends when this tragic incident took place.
First, it is important to note that there is only one serious aggravator present here. The trial court found two aggravators after concluding that the evidence supported four aggravating circumstances, three of which merged and could only be treated as one: the murder was committed while the defendant was engaged in a robbery; the crime was committed for the purpose of avoiding arrest; the crime was committed to disrupt or hinder the enforcement of the laws; and the victim of the crime was a law enforcement officer engaged in the performance of his official duties. As required by law, the trial court merged the second, third and fourth circumstances into one single aggravator. In addition, the trial court gave the first aggravator diminished weight because although it was technically satisfied, the record showed that unlike a distinct and ordinary robbery, Kearse took the weapon to effect the killing and then kept it to conceal his fingerprints. Thus, we are considering a death sentence based upon only two aggravating factors, one of which the trial court itself gave diminished weight. In fact both of the aggravators are based upon the same single factual predicate, the defendant's impulsive and irrational reaction to his confrontation with the police officer victim.
As for mitigation, the trial court found the defendant's age a mitigating factor to which it attributed "some" weight. The trial court also gave "some" weight to numerous nonstatutory mitigators, which include the defendant's: (1) acceptable behavior at trial; (2) low IQ, impulsiveness, and inability to reason abstractly; (3) impulsiveness with memory problems and impaired social judgment; (4) difficulty attending to and concentrating on visual and auditory stimuli; (5) difficulty with perceptual organizational ability and poor verbal comprehension; (6) impaired problem-solving flexibility; (7) deficits in visual and motor performance; (8) lower verbal intelligence; (9) poor auditory short-term memory; (10) mild retardation and ability to function at a third grade level; (11) developmental learning disability; (12) slow learning and need for special assistance in school; (13) severe emotional handicap; (14) impaired memory; (15) impoverished academic skills; (16) mental, emotional and learning disabilities; (17) delayed developmental milestones; (18) severe emotional disturbance as a child; (19) difficult childhood due to social and economical disadvantages; (20) impoverished background; (21) improper upbringing; (22) malnourishment; (23) lack of opportunity to bond with natural father; (24) loss of his father when young boy which forced him to grow up without a male role model; (25) upbringing in a broken home and poverty; (26) dysfunctional family; (27) alcoholic mother; (28) neglect by mother; (29) childhood trauma; (30) physical and sexual abuse; and (31) life in the streets after his mother gave up on him at an early age.[8] *1137 The trial court rejected Kearse's alleged factors that he suffers from fetal alcohol effect and a brain disorder.
The majority relies on Burns v. State, 699 So.2d 646, 651 (Fla.1997), in finding the sentence of death proportional. Burns was a forty-two-year-old adult who had been stopped by a police officer while trafficking in cocaine. A struggle between Burns and the police officer ensued, during which the officer was killed. The trial court found one aggravating factor, two statutory mitigators and several nonstatutory mitigators. These included: (1) Burns was one of seventeen children raised in a poor rural environment with few advantages, but was intelligent and became continuously employed after high school; (2) Burns contributed to his community, graduated from high school, worked hard to support his family, with whom he had a loving relationship, and was honorably discharged from the military, albeit for excessive demerits after only one month and seventeen days of active duty; and (3) Burns had shown some remorse, had a good prison record, behaved appropriately in court, and demonstrated some spiritual growth. See id. at 648-49.
Burns is patently distinguishable from this case. First, unlike Kearse, Burns was in the process of committing a serious felonious criminal offense at the time he was stopped by the officer. Indeed, the Court in Burns explicitly relied on this fact to distinguish the case from another case involving the murder of a law enforcement officer in which we had vacated the sentence of death. Second, the extent and weight of the mitigation in Burns pales in comparison to the mitigation presented herein. Critically, unlike Kearse, Burns was an intelligent forty-two year old adult. There was no indication that he suffered from any mental or emotional difficulties.
Instead, this case is more comparable to Brown v. State, 526 So.2d 903 (Fla.1988), and Songer v. State, 544 So.2d 1010 (Fla. 1989), both of which were cited by Kearse in his appellate brief. In Brown, the defendant killed a law enforcement officer after being stopped during an investigation into a recent robbery that Brown and his companion had committed. We summarized the mitigating evidence as follows:
According to expert testimony, appellant had an IQ of 70-75, classified as borderline defective or just above the level for mild mental retardation. At age ten, he had been placed in a school for the emotionally handicapped. Although chronologically eighteen, he had the emotional maturity of a preschool child. The psychologist concluded that both statutory mental mitigating factors applied, i.e., that the murder was an impulsive act committed while appellant was under the influence of serious emotional disturbance and while his capacity to appreciate the criminality of his conduct or conform his conduct to the law was substantially impaired. Additionally, there was testimony that appellant was not a vicious or predatory-type criminal and rehabilitation thus was likely.
526 So.2d at 908 (footnotes omitted). We held it was error for the trial court to override the jury's recommendation of life because there was sufficient evidence in the record to support the jury's recommendation. Id.
In Songer, the defendant killed a law enforcement officer who apparently approached Songer while he was sleeping in his car. Songer had walked away from a work release program several days earlier. The trial court found one aggravator (defendant was under sentence of imprisonment) and several statutory mitigators: the crime was committed while Songer was under the influence of extreme mental or emotional disturbance, Songer's ability to appreciate the criminality of his conduct or *1138 to conform his conduct to the requirements of law was substantially impaired, and his age, twenty-three years old. The trial court also found several nonstatutory mitigators: Songer's sincere and heartfelt remorse; his chemical dependency on drugs, which caused significant mood swings; his history of adapting well to prison life and using the time for self-improvement; his positive change of character attributes, as manifested in a desire to help others; his emotionally impoverished upbringing; his positive influence on his family despite his incarceration; and his developing strong spiritual and religious standards. See 544 So.2d at 1011.
Like Kearse, the defendant in Songer was not engaged in a serious felonious offense at the time of the murder. However, unlike Kearse, and arguably more aggravating, the police officer in Songer was killed by a hail of bullets as he approached Songer's car. Although Songer involved only one aggravating factor (which this Court diminished due to the fact that Songer had not been imprisoned), this distinction is minimal compared to the factors presented in this case. Here, the murder during a robbery aggravator was given diminished weight by the trial court and the major factor centered on the fact that Kearse killed a law enforcement officer.
Although Songer and Brown contained proof of statutory mental mitigators, that too does not constitute a serious distinction because, although the trial court here did not find any statutory mitigators, it found the evidence sufficient to support numerous nonstatutory mental mitigators. In other words, the court found and gave weight to Kearse's deprived childhood, his economic and social disadvantages, and his low intelligence and emotional difficulties. As noted above, none of these factors were found by the trial court in Burns.
The bottom line is that this is clearly not a death case. It is not one of the most aggravated and least mitigated or among the worst of the worst for which we have reserved death as the only appropriate response. What eighteen-year-old Kearse did was horriblebut his actions in light of the bizarre circumstances in this case do not warrant the ultimate penalty of death.

AGE MITIGATOR
Whether a particular mitigating circumstance exists and the weight to be given to that mitigator are matters within the discretion of the sentencing court. See Campbell v. State, 571 So.2d 415, 420 (Fla. 1990). The trial court's conclusions as to the relative weight will be sustained if "supported by `sufficient competent evidence in the record.'" Id. (quoting Brown v. Wainwright, 392 So.2d 1327, 1331 (Fla. 1981)). In Shellito v. State, 701 So.2d 837 (Fla.1997), we stated that "whenever a murder is committed by a minor, the mitigating factor of age must be found and weighed but that the weight can be diminished by other evidence showing unusual maturity." Id. at 843. However, where the defendant is not a minor, as in the case herein, "no per se rule exists which pinpoints a particular age as an automatic factor in mitigation." Id. "[I]f a defendant's age is to be accorded any significant weight as a mitigating factor, `it must be linked with some other characteristic of the defendant or the crime such as immaturity.'" Mahn v. State, 714 So.2d 391, 400 (Fla.1998). Thus, the existence and weight to be given to this mitigator depends on the evidence presented at trial and the sentencing hearing. See Shellito, 701 So.2d at 843.
Here, the trial court found age as a statutory mitigating factor. However, the court gave this factor only "some" weight because "the defendant had already been through many stages of the criminal justice system" including prison and had "exhibited sophistication rather than naivete." The court noted that the obvious intent of the statute was to give consideration to a youth who acts from immaturity, but found that that was not the case here. The *1139 judge's conclusion is not supported by the evidence.
The evidence demonstrates that Kearse was eighteen years old at the time of the offense. As a child, he was placed in schools for the emotionally handicapped. In 1991, after the commission of the crime, Kearse underwent a series of neuropsychological tests to determine his intellectual functioning. These tests revealed a verbal IQ of 75, placing Kearse in the lower fifth percentile of people in his age group. According to one expert, this score places Kearse in the borderline range of intelligence and means that he has difficulty receiving, integrating, and sequencing information. This expert noted that Kearse's score is similar to the score Kearse received when tested in 1981, which means that his intellectual function did not significantly increase with age. Further testing indicated that in 1991 (at age eighteen) Kearse could spell on a third grade level and do arithmetic on a fourth grade level. According to the defense expert, these scores indicate severe learning problems. Although the State's expert disputed several of the conclusions offered by the defense experts, the State's expert did not challenge the defense's evidence as to learning disabilities except to state his belief that Kearse could at least read on a sixth grade level in order to take the tests. The State's expert agreed that the test results suggest that Kearse has intellectual deficits and subnormal IQ.
The sentencing order fails to acknowledge this evidence. Further, contrary to the trial court's conclusion, the record establishes that Kearse operated at an intellectual level much lower than his chronological age. Accordingly, I believe the trial court's conclusion with regard to this mitigator is erroneous. Greater weight should have been given to this factor.

STANDARD OF REVIEW FOR CAUSE CHALLENGES
I am also concerned that the majority opinion is not upholding our prior rulings that any doubts about impartiality should be resolved in favor of granting a for-cause challenge. In this case, Kearse challenged the trial court's for-cause determination as to three jurors: juror Jeremy who was excused for cause based on her anti-death views and jurors Barker and Foxwell who were not excused for cause despite their pro-death views. The majority holds that the trial court did not err in excusing juror Jeremy because she stated that her feelings about the death penalty would impair her ability to impose a death sentence. The majority further holds that the trial court did not err in denying Kearse's for-cause challenge as to the other two jurors because, "[a]lthough they stated certain biases and prejudices, each of them also stated that could set aside their personal views and follow the law in light of the evidence presented." Majority op. at 1129. This analysis is incomplete.
In Singer v. State, 109 So.2d 7 (Fla. 1959), this Court stated "that if there is basis for any reasonable doubt as to any juror's possessing that state of mind which will enable him to render an impartial verdict based solely on the evidence submitted and the law announced at the trial he should be excused on motion of a party, or by the court on its own motion." Id. at 23-24. The Singer opinion emphasized that "a juror's statement that he can and will return a verdict according to the evidence submitted and the law announced at the trial is not determinative of his competence, if it appears from other statements made by him or from other evidence that he is not possessed of a state of mind which will enable him to do so." Id. at 24. We stressed that the test should not be "whether the juror will yield his opinion, bias or prejudice to the evidence, but should be that whether he is free of such opinion, prejudice or bias or, whether he is infected by opinion, bias or prejudice, he will, nevertheless, be able to put such completely out of his mind and base his verdict only upon the evidence given at the trial." Id.
*1140 This Court applied the same rule in Hill v. State, 477 So.2d 553 (Fla.1985), in analyzing whether a juror should have been excused for cause in light of that juror's views on the death penalty. During voir dire, the juror expressed a strong bias in favor of the death penalty and, based on media accounts of the events, had formed an opinion as to the guilt or innocence of the participants. However, the juror stated that he believed he could set his opinion aside and listen to the evidence presented in court. During voir dire, the following was also said:
PROSECUTOR: Have you ever thought about what type of case would deserve a death sentence?
JOHNSON: Yes, sir, premeditated murder, and felony murder.
When asked by defense counsel how he was going to keep his preconceived opinion from affecting his deliberations, Mr. Johnson answered as follows:
Well, basically, like I said, I have not associated that opinion with Mr. Hill. It was just a blank feeling that ... someone that shoots someone else should be punished.
. . . .
I feel anyone that shoots anyone else in the type of incident as much as I know about it now, the death penalty should be imposed upon them. That's basically what I felt at the time.
(Emphasis supplied). Later in the inquiry, with regard to the imposition of the death penalty, defense counsel asked:
Do you feel like from under the facts that you know now, do you feel like this might be an appropriate case?
JOHNSON: I don't feel I have really been given any more facts than I have before coming into the courtroom.
DEFENSE COUNSEL: You formed an opinion before though?
JOHNSON: Yes, sir.
DEFENSE COUNSEL: Have you discarded that opinion?
JOHNSON: Not necessarily.
DEFENSE COUNSEL: Do you feel that in all cases of premeditated murder that the death penalty should be applied?
JOHNSON: It's a hard question to answer.
DEFENSE COUNSEL: Yes, sir, sure is.
JOHNSON: I'm not saying in all cases, dependent upon the evidence.
DEFENSE COUNSEL: Are you still inclined towards the death penalty in this case if in fact there is a conviction?

JOHNSON: Yes, sir.

DEFENSE COUNSEL: That's the presumption that you came into this court with?

JOHNSON: Yes, sir.

Id. at 555. This Court held that juror Johnson should have been excused for cause and explained that
[i]t is exceedingly important for the trial court to ensure that a prospective juror who may be required to make a recommendation concerning the imposition of the death penalty does not possess a preconceived opinion or presumption concerning the appropriate punishment for the defendant in the particular case. A juror is not impartial when one side must overcome a preconceived opinion in order to prevail. When any reasonable doubt exists as to whether a juror possesses the state of mind necessary to render an impartial recommendation as to punishment, the juror must be excused for cause.
Id. at 556 (emphasis added).
Here, the trial court denied defense challenges to jurors Barker and Foxwell for cause based on their views as to the appropriate punishment, and Kearse was forced to peremptorily strike both jurors. The majority opinion correctly states the test for determining juror competency. *1141 The majority also correctly states the concept that a juror should be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind. See majority op. at 1128. However, contrary to the summary conclusion of the majority opinion, it appears the trial court erred in refusing to excuse jurors Barker and Foxwell for cause, and the majority fails to acknowledge our holdings that any reasonable doubt requires excusal of the juror.
Juror Barker stated that she favored the death penalty. During voir dire, she further stated that in deciding whether to recommend life or death, she would "have to be assured that the perpetrator would not be put into prison where conjugal visits would be allowed or perhaps the fact that he could get out on a technicality." She then claims that she could recommend a life sentence if she "was assured that there would be no chance of parole at any time." Defense counsel informed juror Barker that there would be no such assurances during trial and asked whether that would be a concern for her. The juror responded that she would have to "weigh the evidence and decide." She later admitted that there were circumstances where life would be the appropriate penalty. Although juror Barker claimed that she would weigh the evidence and decide accordingly, I am concerned with her initial comment that she would require assurances that a life sentence meant a true life sentence. Her statements indicate that the defense would have the burden of assuring her that the defendant would remain in prison for the rest of his life. Despite juror Barker's promise to weigh the evidence, her initial statements created a reasonable doubt as to her ability to consider life as one of the permissible forms of punishment.
Juror Foxwell expressed frustration with the criminal system, stating: "I don't understand Florida law as far as he's already been tried and convicted, I mean, why in the heck do we have to go through all this expense again to sentence him?" After a brief explanation by defense counsel, juror Foxwell asserted that he could listen to the evidence and follow the law. However, he then stated that he was a strong proponent of the death penalty because there is nothing worse than taking a life. Foxwell told the defense counsel that he would "have to do a lot of talking" to change his mind. The following colloquy occurred next:
Defense counsel: All things being equal, would it be fair to say that just knowing what you know as of now about the evidence you're going to hear, would it be fair to say that you're going to tend to recommend death under these facts based upon your feelings?
Mr. Foxwell: Well you've already told us he's been convicted. Now you got to convince us another way, right?
Defense counsel: That's what I'm saying. If that's the way you feel, correct?
Mr. Foxwell: Yes.
The next day, the State asked juror Foxwell whether he could listen to the evidence and make a determination based on the law as instructed. The juror responded: "I would try my damndest." He further stated that he would consider whatever evidence the defense presented in mitigation.
That juror Foxwell stated that he would listen to the evidence and would follow the law is not dispositive if such assurances are insufficient to overcome his earlier statements concerning his preconceived view about punishment. See Singer. Juror Foxwell clearly stated that the defense would have to "change his mind" in order to overcome his belief that death was the appropriate penalty. His statements during voir dire created a reasonable doubt as to his impartiality and the trial court should have ruled in favor of the defense and excused juror Foxwell for cause.[9]

*1142 WITHDRAWAL OF WAIVER OF VENUE
Article I, section 16 of the Florida Constitution guarantees defendants the right "to have a speedy and public trial by an impartial jury in the county where the crime was committed." This Court has construed this right as an important one which "must not be lightly treated." O'Berry v. State, 47 Fla. 75, 86, 36 So. 440, 444 (1904); see also Rhoden v. State, 179 So.2d 606, 607 (Fla. 1st DCA 1965) (noting that right to jury trial in county where crime was committed is a right that should be "jealously guarded"). Undoubtedly, Kearse had the constitutional right to be tried in Port St. Lucie County since that is where the crime was committed. He waived that right, however, when he requested a change of venue due to pretrial publicity.
The trial court in this case concluded that a defendant could not withdraw a waiver of venue. Nevertheless, this Court has recognized the proper withdrawal of a waiver of another similar constitutional right-the right to a jury trial. In fact, the same constitutional provision that guarantees defendants the right to be tried in the county where the crime occurred also guarantees defendants the right to be tried by an impartial jury. See Art. I, § 16(a), Fla. Const.
In Floyd v. State, 90 So.2d 105 (Fla. 1956), the defendant waived his right to a jury trial and then later attempted to withdraw that waiver. This Court held that a defendant may withdraw a waiver of jury trial if he or she does so in good faith and the withdrawal will not cause delay or harm to the State:
It would appear to us that the fundamental and cherished right of trial by jury will best be protected and be caused to "remain inviolate" if the withdrawal of the waiver to such a trial is refused by a court only when it is not seasonably made in good faith, or is made to obtain a delay, or it appears that some real harm will be done to the public, i.e., the State, such as unreasonable delay or interruption of the administration of justice, real inconvenience to the court and the State, or that additional expense to the State will be occasioned thereby.
Id. at 106. Because there was nothing to show that the State or the court would have been inconvenienced in any way if the motion was granted and no valid ground for denying the motion had been asserted, this Court held the trial court had abused its discretion in denying Floyd's motion to withdraw the waiver of jury trial. Id. at 107. The same principle should apply here.
Because Kearse has a constitutional right to be tried in the county where the crime occurred and specifically requested to be tried in St. Lucie county,[10] Kearse should have been permitted to withdraw his earlier waiver of venue. The motion appears to have been made in good faith, and there is no evidence in the record that the State or the court would have been inconvenienced.
Importantly, the record reflects that many phases of the proceedings occurred in St. Lucie County and it does not appear the state would have been harmed if this case remained there. During Kearse's initial *1143 trial, and despite the change of venue to Indian River County, the trial court transferred the case back to St. Lucie County for sentencing, from which the notice of appeal was subsequently filed. On appeal, this Court remanded the case to St. Lucie County for resentencing. The crime occurred in St. Lucie County, the pretrial hearings were being held in St. Lucie County, and the trial court did not anticipate any problems with obtaining an available courtroom in St. Lucie County. Because a jury had to be impaneled in either county, there was no showing that holding the resentencing in St. Lucie County would cause additional delays. Although the court was concerned with pretrial publicity and its effect on the ability to find impartial jurors, there is no evidence that it would be difficult or impossible to obtain an impartial jury in St. Lucie County. The trial was originally held in 1991 and the resentencing took place in 1996, five years later. Thus, at this stage of the proceedings, there was no showing that the parties could not have obtained an impartial jury.
Further, Kearse's motion appears to have been made in good faith. He argued that holding the resentencing in Indian River County could prejudice his case because of a difference in the number of African Americans in Indian River County compared to St. Lucie County. He pointed out that the percentage of African Americans in the population in St. Lucie County was almost twice the percentage of African Americans in Indian River County. In addition to the differences in the racial makeup of the two counties, Kearse noted the fact that the prosecutor had recently been elected a judge in Indian River County. Under these circumstances, the trial court abused its discretion in denying Kearse's request to be resentenced in St. Lucie County.

PROSECUTOR'S "NO MERCY" ARGUMENT
During the State's opening statement to the jury, the prosecutor identified the facts he believed the evidence would show and then concluded with the following remarks:
Now I don't know what the Defense is going to show you in an attempt to mitigate this horrible crime. We have some idea based on voir dire, but we'll have to wait and see. But whatever that mitigation is, I would ask you now, listen to it, consider it and then ask yourself what does this have to do with the true character of the Defendant on January 18th, 1991 when he took that gun and pulled that trigger 14 times.[[11]]
We are here because this Defendant is guilty of murder. We are here because the Defendant wants to live, even though he denied that right to Officer Parrish. The bottom line, Ladies and Gentlemen, is we're here seeking justice on behalf of Officer Danny Parrish. A voice we're going to bring from six years ago demand justice. We are here asking you to show this Defendant the same mercy he showed Officer Parrish, except in this courtroom it will be in accordance with the law.
Defense counsel moved for mistrial on the "no mercy" argument. Following the trial court's denial of the defense motion, the prosecutor reiterated its "no mercy" argument, stating "at the end of this proceeding, we're going to ask you to show this Defendant the same consideration that he showed Officer Parrish almost six years ago [by sentencing him to death]."
The majority opinion agrees that the prosecutor's remarks were improper. *1144 However, the majority holds that the prosecutor's "no mercy" comment during opening statement to the jury was not prejudicial. The opinion relies on Rhodes v. State, 547 So.2d 1201 (Fla.1989), and Richardson v. State, 604 So.2d 1107 (Fla.1992), in support of its conclusion that although the "no mercy" comments were improper, they do not require reversal. Both cases can be distinguished by the simple fact that they involved statements made during closing argument.
Here, the prosecutor's remarks are especially troubling because the comment was made during opening statement. The defense did not present opening remarks at this stage of the proceeding, having reserved the right to make an opening statement at a later time. The purpose of opening statement is to recite the facts the attorney believes will be proven by the evidence at trial. See Occhicone v. State, 570 So.2d 902, 903 (Fla.1990). Arguments and personal opinions are inappropriate. See First v. State, 696 So.2d 1357, 1358 (Fla. 2d DCA 1997) (reversing for new trial where prosecutor expressed personal belief during opening statement that defendant's alibi witness was a "liar"). The prosecutorial comments here set the course for the entire proceeding because they established that justice could only be served by imposing death (i.e., the same fate met by Officer Parrish). Thus, the jury started listening to the State's evidence immediately after the prosecutor's erroneous remarks. Under these circumstances, it is difficult to say that the prosecutor's final words had no effect on the jurors' minds.
SHAW and PARIENTE, JJ., concur.
NOTES
[1] Rule 3.202(a) was amended on rehearing to provide that the state must give written notice of its intent to seek the death penalty within forty-five days from the date of arraignment. See Amendments to Fla. Rule of Crim. Pro. 3.220-Discovery, 674 So.2d 83, 85 (Fla.1995). Prior to the amendment, the state had ten days from arraignment to give such notice. See id. at 84.
[2] Rule 3.202(c) was amended on rehearing to provide that the defendant must give notice of intent to present expert testimony of mental mitigation "not less than 20 days before trial." Amendments to Fla. Rule of Crim. Pro. 3.220-Discovery, 674 So.2d 83, 85 (Fla.1995). Prior to the amendment, the defendant was required to give notice of such intent "within 45 days from the date of service of the state's notice of intent to seek the death penalty." Id. at 84.
[3] Florida Rule of Criminal Procedure 3.220 governs discovery in all criminal proceedings.
[4] The State did not seek to establish either the cold, calculated, and premeditated or the heinous, atrocious, or cruel aggravating factors.
[5] The photographs included: the victim's left arm depicting a bullet entry which shattered the bone; the victim's left leg where bullets shattered the two leg bones; the victim's back depicting impact injuries from bullets that stuck the victim's bulletproof vest and other wounds where bullets either entered and exited the body or were lodged under the skin; the victim's front depicting eight bullet impacts, one exit wound, and a surgical scar on the front of the abdomen from resuscitation efforts by medical personnel; and an x-ray depicting bullets inside the victim's body and injury to his spine.
[6] See, e.g., Bonifay v. State, 680 So.2d 413, 419-20 (Fla.1996) ("Clearly, the boundaries of relevance under the statute include evidence concerning the impact to family members. Family members are unique to each other by reason of the relationship and the role each has in the family. A loss to the family is a loss to both the community of the family and to the larger community outside the family.").
[7] Section 921.141(7), Florida Statutes (1997), provides:

VICTIM IMPACT EVIDENCE.Once the prosecution has provided evidence of the existence of one or more aggravating circumstances as described in subsection (5), the prosecution may introduce, and subsequently argue, victim impact evidence. Such evidence shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence.
[8] These factors were not individually listed in the sentencing order. Rather, the trial court grouped them together and treated them categorically. The list of factors is contained in the Defendant's Memorandum Regarding Sentencing.
[9] Because Kearse was forced to use two of his peremptory strikes in order to remove jurors Barker and Foxwell from the panel, exhausted his peremptory challenges, and was denied additional peremptory strikes, the denial of the for-cause challenges constitutes reversible error. See Hill, 477 So.2d at 556 ("[I]t is reversible error for a court to force a party to use peremptory challenges on persons who should have been excused for cause, provided the party subsequently exhausts all of his or her peremptory challenges and an additional challenge is sought and denied.").
[10] As the majority points out in its opinion, the record reflects that Kearse initially requested that resentencing be held in Indian River County. However, the majority fails to mention that after the recusal of Judge Walsh, the defense renewed its motion to establish venue in St. Lucie County and at a hearing on the matter, Kearse stated that he would prefer to be tried in St. Lucie County.
[11] This remark is also troubling because the prosecutor essentially is telling the jury that whatever the defense presents as mitigation about the defendant's background does not matter. Although this too was an improper expression of the prosecutor's personal opinion on evidence that had not yet been submitted, it was not objected to at trial and appellate counsel did not present this issue on appeal. Thus, this issue is not presently before the Court.