730 So.2d 277 (1999)
Fernando FERNANDEZ, Appellant,
v.
STATE of Florida, Appellee.
No. 84,700
Supreme Court of Florida.
February 25, 1999.
Rehearing Denied April 15, 1999.
*278 Alfonso M. Saldana, Miami, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Randall Sutton, Assistant Attorney General, Miami, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Fernando Fernandez. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the convictions. However, because we find that appellant's death sentence is not proportional, given the circumstance that Fernandez was not a triggerman, to the life sentences of his codefendants Pablo Abreu and Pablo San Martin, we vacate the death sentence and remand for imposition of a life sentence.
Fernandez and codefendants Leonardo Franqui, Ricardo Gonzalez, San Martin, and Abreu were charged with first-degree murder of a law enforcement officer, armed robbery with a firearm, aggravated assault, unlawful possession of a firearm while engaged in a criminal offense, third-degree grand theft, and burglary.[1] Fernandez was tried before a jury in May 1994.
*279 On January 3, 1992, a cash box was stolen at gunpoint from a drive-in teller at the Kislak National Bank in North Miami. The perpetrators fled the scene in two stolen grey Chevrolet Caprice cars. During the robbery, two gunmen shot and killed North Miami police officer Steven Bauer. Shortly thereafter, the stolen vehicles were found abandoned two blocks from the bank.
The day after the murder, appellant was watching television at the home of Claudio Prado when a report of the North Miami bank robbery and murder was broadcast. Prado testified that appellant listened to the television report and then told Prado that he had been involved in the crime and wanted to see a Santeria priest known as a babalao. Prado testified that he took appellant that same day to see Lazaro Hernandez, who was a babalao, and that appellant asked Hernandez to perform a ritual to prevent appellant from being apprehended. Hernandez subsequently informed police as to appellant's statements to him regarding the crime and shared a $100,000 reward with Prado.
Upon his arrest, appellant led police to the codefendants, who confessed that they had participated in the robbery and murder. Ballistics evidence showed that Gonzalez fired a .38 revolver, hitting the victim in the neck, and Franqui fired a .9 mm handgun. San Martin took the money tray, and Abreu drove a getaway car in which he waited a few blocks from the crime scene and then transported the perpetrators to his apartment.
Five months after the robbery and murder, inmate Luis Sanchez befriended appellant while both were in jail. Sanchez testified that appellant told him that a friend named Gary Cromer had described a bank robbery plan to him and that appellant had "stolen" the plan for his own use. Appellant told Sanchez that he obtained the guns used in the robbery, stole the getaway cars, drove the codefendants to the crime scene, witnessed the crime, facilitated the getaway, and shared in the proceeds of the robbery. Cromer testified that he and a friend had devised the bank robbery plan in 1991, and Cromer had later described the plan to appellant. Three or four weeks before the crime, appellant introduced Cromer to the codefendants. Cromer then went with appellant and the codefendants to the bank and showed them the usual routine of the bank tellers as they opened their stations for business. Cromer said he did not participate in the robbery or share in the proceeds.
Abreu pled guilty prior to trial and received a life sentence. The remaining defendants moved in pretrial motions to suppress their confessions and sever their trials based upon their allegedly inconsistent statements given to police. After hearings, the court denied all of the codefendants' motions except for appellant's motion to sever his trial. Pursuant to the court's order, the confessions of the codefendants were not admitted at trial against appellant. The codefendants were tried together with two juries, designated "Jury A" to hear appellant's case and "Jury B" to hear the cases of Franqui, Gonzalez, and San Martin.[2] Jury A found appellant guilty of first-degree murder of a law enforcement officer, armed robbery, aggravated assault, and both counts of grand theft and burglary.
During the penalty phase, the State relied on evidence presented during the guilt phase. The defense presented testimony of appellant's mother, who testified that she once *280 asked appellant to sell cocaine in order to raise money to post bond for appellant's father, who was in jail on a drug charge. Appellant's sister testified that she and appellant used illegal drugs at home and that their parents never tried to stop them. The defense also presented testimony of a prison chaplain who stated that appellant was remorseful and a psychologist who stated that appellant tested just below the low-average range of intelligence and that he had a personality disorder. Appellant testified that he tried to back out of the robbery on the morning of the crime but could not because Franqui threatened to shoot him and harm his family. The jury recommended a death sentence by a vote of seven to five.
A sentencing proceeding was held before the court, and additional testimony was presented. The defense presented a transcript of the statement that appellant made to police two weeks after the murder of Officer Bauer in which appellant stated that he participated in the crime under duress because of threats by Franqui. The State presented testimony of Hialeah police detective Albert Nabut, who interviewed appellant after an attempted robbery and murder near Hialeah. The detective stated that appellant told him he had informed Franqui and San Martin of the existence of a check-cashing business run by Danilo Cabanas and his son. Franqui, San Martin, and Abreu subsequently attempted to rob Cabanas at gunpoint after he left a bank with $25,000 accompanied by his son and Raul Lopez. During the attempted robbery, Lopez was killed by a bullet consistent with a .357 revolver used by Franqui.[3]
In this case, the judge considered the jury's recommendation and sentenced appellant to death, finding three aggravating circumstances: previous convictions of violent felonies; murder committed during the course of a robbery and for pecuniary gain (merged into one aggravator); and murder for the purpose of avoiding or preventing lawful arrest or effecting an escape from justice and that the victim was a law-enforcement officer (merged into one aggravator). See § 921.141(5)(b), (d), (e), (f), (j), Fla. Stat. (1993). The court gave great weight to these aggravating circumstances and found no statutory mitigating circumstances. Of the nonstatutory mitigating circumstances proffered by the defense, the court found that only two were proven: family history of cocaine use by appellant and his parents and appellant's cooperation with authorities. The court gave these mitigating circumstances little weight. In the sentencing order, the trial court provided an Enmund-Tison[4] analysis and concluded that appellant was eligible for the death penalty because he was a major participant in the crime, intended lethal force to be used, and had exhibited a reckless indifference to human life.
In this Court, appellant appeals his convictions and death sentence and raises twelve issues.[5]

*281 GUILT PHASE

Appellant first contends that the trial court erred in granting the State's challenges for cause against four prospective jurors who stated during voir dire that they were opposed to the death penalty. Appellant alleges that these four venirepersons should not have been excused because, upon examination by defense counsel, they stated that they could follow the law. First, defense counsel did not specifically object on these grounds to the State's challenges to the four venirepersons or to the court's granting of them. See Turner v. State, 645 So.2d 444, 446 (Fla. 1994). Therefore, this claim is procedurally barred. Even if this claim had been properly preserved for appellate review, our examination of the prospective jurors' statements during voir dire reveals that this claim has no merit. The standard for determining whether a prospective juror may be excused for cause because of his or her views of the death penalty is whether the prospective juror's views would prevent or substantially impair the performance of his or her duties as a juror in accordance with the juror's instructions or oath. See Foster v. State, 679 So.2d 747 (Fla. 1996). It is within a trial court's province to determine whether a challenge for cause is proper, and the trial court's determination of juror competency will not be overturned absent manifest error. See Mendoza v. State, 700 So.2d 670, 675 (Fla. 1997), cert. denied, ___ U.S. ___, 119 S.Ct. 101, 142 L.Ed.2d 81 (1998). The four prospective jurors to whom appellant points gave equivocal responses to questions from the prosecutor, defense counsel, and the court as to whether they could follow the law and set aside their beliefs concerning the death penalty. We find that no manifest error has been shown here.
Appellant next argues that the trial court erred in denying a defense motion for mistrial based on unduly prejudicial references in the prosecutor's opening statement. Appellant contends that the prosecutor's references to appellant as "a robber and a murderer" and to the victim as singing a Christian song just before he was shot were designed to inflame the jury. Appellant also argues that the prosecutor further attempted to inflame the jury by describing the bullet's trajectory through the victim's body. A trial court has discretion in controlling opening statements, which are not evidence. See Occhicone v. State, 570 So.2d 902, 904 (Fla. 1990). We will not interfere unless an abuse of discretion is shown. See Moore v. State, 701 So.2d 545, 551 (Fla. 1997), cert. denied ___ U.S. ___, 118 S.Ct. 1536, 140 L.Ed.2d 685 (1998). We find the trial court did not abuse its discretion in allowing these statements, which were later supported by evidence presented.
As part of this second claim, appellant also contends that the trial court erred in permitting two bank tellers at the Kislak National Bank to testify as to Officer Bauer's last words inquiring as to the well-being of the tellers. Appellant argues that the statements were hearsay and not relevant to any issue in the case and any possible probative value was outweighed by the prejudicial effect of the statements. We previously addressed this same issue in the direct appeal of codefendant San Martin and found the claim to be without merit. San Martin v. State, 717 So.2d 462 (Fla. 1998). We concluded that the trial court did not err in admitting Bauer's statements through the tellers' testimony. Id. The complained-of statement was relevant to the victim's duties as a police officer, and the victim's employment status at the time of the robbery was pertinent to the potential penalty and to the applicability of the law-enforcement-officer aggravator. As in San Martin, we find no abuse of discretion by the trial court.
*282 In his third issue, appellant argues that the trial court erred in allowing into evidence the victim's bloodstained police shirt and undershirt. At trial, defense counsel objected to admission of these items based on an argument that the evidence was cumulative to previously admitted photographs and was unduly prejudicial. The trial court overruled the objection, finding the shirts to be relevant evidence because the bullet hole was not visible in photographs of the clothing that were admitted. In similar circumstances, we have held that actual clothing is admissible. See Larkins v. State, 655 So.2d 95, 99 (Fla. 1995); Reaves v. State, 639 So.2d 1, 5 (Fla. 1994). Determination of whether certain evidence is admissible should be made in the context of the relevancy test. Larkins, 655 So.2d at 99. As to admission of the bloody shirts, the record reflects that the shirts were relevant evidence to establish the fact that the victim was a police officer and to assist the prosecutor's expert witness in explaining how the shooting occurred.
Appellant contends in this appeal that even if the blood-stained clothing was relevant evidence, its probative value was substantially outweighed by the danger of unfair prejudice under section 90.403, Florida Statutes (1991). A trial judge must balance the import of the evidence with respect to the case of the party offering it against the danger of unfair prejudice. See Williamson v. State, 681 So.2d 688, 696 (Fla. 1996). In this case, as in Williamson, the record reflects that the trial judge performed the necessary weighing. We conclude that the shirt was relevant to support the State's expert testimony explaining the shooting and was not made a feature of the trial. Therefore, we find no abuse of discretion as to this claim.
Appellant argues in his fourth issue that the trial court erred in allowing witnesses Hernandez and Prado to testify as to inculpatory statements appellant made in their presence. Appellant argues that these statements were privileged under the clergy communications privilege, section 90.505, Florida Statutes (1993), because the witnesses were, respectively, a Santeria priest and a novice Santeria priest.
We find that appellant's claim as to Prado was not preserved for appellate review because the defense made no objection on these grounds when Prado testified. As to Hernandez, we find no merit in appellant's claim that Hernandez' testimony concerning appellant's statements qualifies as a privileged communication. Communications to a member of the clergy which are confidential and made for the purpose of seeking spiritual advice are privileged. § 90.505, Fla. Stat. (1993). Assuming that Hernandez was a member of the clergy to whom appellant went for spiritual advice, we still must determine under section 90.505 whether appellant's communication to him was confidential. Our review of the record indicates that Hernandez testified on direct examination that Hernandez' wife and children, in addition to appellant's girlfriend and her children, were present in the room at the time appellant made his statement concerning the crime. On cross-examination, Hernandez testified that he met with appellant "[n]ot so privately." Section 90.505 explicitly defines confidential communications for the purpose of clergy privilege as those communications that are "made privately." § 90.505(1)(b), Fla. Stat. (1993). Thus, we find no abuse of discretion in the trial court's ruling against any claim to clergy communications privilege as to Hernandez because appellant's statement to Hernandez was made in the presence of others.
In his fifth issue, appellant contends that the trial court erred in limiting the defense counsel's cross-examination of witnesses Prado and Hernandez which was designed to impeach their credibility. Appellant contends that defense counsel should have been allowed to attempt to establish that Prado and Hernandez had violated religious oaths in talking to police about appellant's statements to them. We have held that evidence of particular acts of ethical misconduct cannot be introduced to impeach the credibility of a witness. The only proper inquiry into a witness's character for impeachment purposes goes to the witness's reputation for truth and veracity. See Farinas v. State, 569 So.2d 425, 429 (Fla. 1990). Allowing this testimony would violate sections *283 90.608, 90.609, and 90.610, Florida Statutes (1993), which prohibit impeachment by reference to specific bad acts other than convictions for felonies or misdemeanors involving dishonesty. We find no error in the trial court's limitation of cross-examination of Prado and Hernandez on grounds that the defense questioning was irrelevant and thus no abuse of discretion as to this claim.
We find no reversible error in the guilt phase of appellant's trial. We find that appellant's convictions are supported by competent, substantial evidence, and we affirm his convictions.

PENALTY PHASE
Turning to the penalty phase, we discuss only appellant's ninth claim, which presents the dispositive penalty-phase issue as to appellant's individual culpability and the proportionality of the death sentence in this felony murder. Appellant claims that, under Enmund-Tison, a death sentence is not appropriate because he was merely a getaway driver, not a triggerman in the crime. Appellant contends that the trial court erred in finding that he was a major participant in the crime, and compares his role in the robbery-murder to that of the defendants in Enmund and Jackson v. State, 575 So.2d 181 (Fla. 1991). In Enmund, the United States Supreme Court reversed a death sentence based on evidence that the defendant had no role in the robbery-murder other than that of a getaway driver. Enmund, 458 U.S. at 785, 102 S.Ct. 3368. In Jackson, this Court similarly reversed a death sentence in a case based on circumstantial evidence pointing to Jackson as merely a getaway driver. Jackson, 575 So.2d at 192-93.
In this case, the record shows that appellant was inside a getaway car during the robbery-murder at the Kislak National Bank. The record reveals and we find that appellant's degree of participation in the crime was similar to that of codefendant Abreu, a getaway driver who received a life sentence after a plea negotiation. Additionally, this Court reversed the jury-override death sentence of codefendant San Martin, who was unarmed during the robbery-murder and whose role in the crime was to take the money tray from the bank tellers and to dispose of the guns. We find that a death sentence for appellant, who did not directly participate in the actual killing, would be disproportionate relative to the life sentences of Abreu and San Martin, who also did not directly participate in the killing.
We find appellant's penalty-phase claims six through eight to be moot in light of our reversal of the death sentence. Claims ten through twelve are procedurally barred because they were not preserved for appellate review.

CONCLUSION
For the reasons expressed, we affirm appellant's convictions, reverse his death sentence, and remand for a sentence of life in prison without possibility of parole.[6]
It is so ordered.
HARDING, C.J., SHAW, ANSTEAD, and PARIENTE, JJ., and OVERTON and KOGAN, Senior Justices, concur.
WELLS, J., dissents with an opinion.
WELLS, J., dissenting.
The majority holds that under Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), a death sentence is not appropriate in this case because appellant was merely a getaway driver, not a triggerman, in the crime. However, my close reading of the record reflects that, although appellant did serve as a getaway driver, he also played a far more extensive role in the robbery-murder and thus was a first-degree principal and a major participant. Under these circumstances, a death sentence is proportional as compared with the codefendants' sentences *284 and with those of other defendants convicted of first-degree murder. I find no error in the jury's recommendation and the trial court's imposition of a sentence of death.
The record reveals that appellant's degree of participation in the crime was greater than that of codefendant Abreu, who received a life sentence after a plea negotiation, and greater than that of codefendant San Martin, whose jury-override death sentence was reduced to life imprisonment by this Court. According to the record, it was appellant who brought to the group the plan for the robbery, stole the getaway cars, obtained the murder weapons, then drove the codefendants to the scene of the crime, remained there to witness the crime, and shared in the proceeds of the robbery. By contrast, Abreu was solely a getaway driver whose participation in the robbery was to wait a few blocks away to aid the defendants in their escape. Codefendant San Martin's role was limited to taking the money tray from the bank tellers and disposing of the guns used in the murder.[7]
Appellant further contends that the trial court erred in finding him recklessly indifferent to human life. He argues that no evidence shows that appellant knew just before the robbery that guards would be nearby and that there would be any need for deadly force. However, as the trial judge in this case stated in the Enmund-Tison portion of his sentencing order:
The defendant was the first of these defendants to know the intended target of their nefarious scheme. He knew that the target was not an easy mark; he knew that there would be a police officer or armed guard protecting the tellers; he knew or should have known that the officer would not just allow the robbery to happen; he knew that his accomplices were armed and he knew that they were violent men who had already acted violently in the attempted robbery of the Cabanas, another robbery he had set up from behind the scenes.
Thus, based on the trial court's finding that appellant was a major participant in the crime and was recklessly indifferent to human life, I would affirm the trial court's Enmund-Tison analysis, which was thoroughly set forth in the sentencing order. Accordingly, I would affirm the death sentence.
NOTES
[1] After its opening statement, the State filed a nolle prosequi as to one count of aggravated assault and the charge of unlawful possession of a firearm during a criminal offense.
[2] The jury recommended a life sentence for San Martin, and the judge overrode the recommendation and imposed a death sentence. This Court affirmed San Martin's conviction but vacated his death sentence and remanded for a life sentence on a finding of the trial court's improper override of the jury's recommendation of a life sentence. San Martin v. State, 717 So.2d 462 (Fla. 1998). The jury recommended and the court imposed death sentences upon Franqui and Gonzalez. This Court affirmed the convictions of Franqui and Gonzalez but vacated the death sentences and remanded for new penalty-phase proceedings based on the erroneous admission of the codefendants' statements that implicated each other as the aggressor. Gonzalez v. State, 700 So.2d 1217, 1219 (Fla. 1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1393, 140 L.Ed.2d 652 (1998), and cert. denied, ___ U.S. ___, 118 S.Ct. 1856, 140 L.Ed.2d 1104 (1998); Franqui v. State, 699 So.2d 1332, 1336 (Fla. 1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1337, 140 L.Ed.2d 499 (1998), and cert. denied, ___ U.S. ___, 118 S.Ct. 1582, 140 L.Ed.2d 797 (1998).
[3] San Martin and Franqui were tried and sentenced to death for the Hialeah crime. This Court affirmed their death sentences. San Martin v. State, 705 So.2d 1337 (Fla.1997), cert. denied, ___ U.S. ___, 119 S.Ct. 105, 142 L.Ed.2d 84 (1998); Franqui v. State, 699 So.2d 1312 (Fla. 1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1337, 140 L.Ed.2d 499, and cert. denied, ___ U.S. ___, 118 S.Ct. 1582, 140 L.Ed.2d 796 (1998). Abreu negotiated a plea and testified at the penalty phase as to the planning of the crime.
[4] Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). In Enmund, the United States Supreme Court held that the Eighth Amendment of the United States Constitution does not permit imposition of the death penalty on a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." 458 U.S. at 797, 102 S.Ct. 3368. In Tison, the Supreme Court held that "major participation in the felony committed, combined with reckless indifference to human life is sufficient to satisfy the Enmund culpability requirement" for imposing a death sentence under a felony murder theory. 481 U.S. at 158, 107 S.Ct. 1676.
[5] Appellant's claims are as follows: (1) the trial court erred in granting the State's challenges for cause against four prospective jurors; (2) the trial court erred in denying a defense motion for mistrial based on unduly prejudicial statements in the State's opening statement; (3) the trial court erred in admitting the victim's bloody shirts; (4) the trial court erred in permitting State witnesses Prado and Hernandez to testify as to statements appellant made in their presence; (5) the trial court erred in limiting defense counsel's cross-examination of State witnesses Prado and Hernandez; (6) the trial court erred in denying defendant's motion for a continuance of the penalty phase; (7) the trial court erred in finding that certain aggravators had been proven beyond a reasonable doubt; (8) the trial court erred in weighing proffered mitigation; (9) the trial court erred in imposing a death sentence because the individual culpability test has not been met and therefore a death sentence is not proportional; (10) the trial court erred in instructing the jury during the penalty phase; (11) the trial court erred in allowing the State to make improper comments during closing argument; and (12) the death sentence constitutes cruel and unusual punishment under the United States or Florida constitutions.
[6] If a death sentence is not imposed, the penalty for first-degree murder of a law enforcement officer is life imprisonment without eligibility for release. See § 775.0823(1), Fla. Stat. (1991). The jury's guilt-phase verdict specifically found that Steven Bauer was a law enforcement officer. Therefore, appellant is to be sentenced to life imprisonment without possibility of parole.
[7] Appellant also notes that this Court has reversed death sentences against two codefendants, Franqui and Gonzalez, who were the actual shooters during the robbery-murder. However, our reversal of the death sentences of Franqui and Gonzalez was on grounds entirely unrelated to the proportional culpability issue under the Enmund-Tison requirement.