902 So.2d 930 (2005)
Mary SOMERVILLE, as Personal Representative, etc., Appellant,
v.
Ratan K. AHUJA, M.D., et al., Appellees.
No. 5D04-1688.
District Court of Appeal of Florida, Fifth District.
June 3, 2005.
*932 Gregorio A. Francis of Morgan, Colling & Gilbert, P.A., Orlando, for Appellant.
John S. McEwan, II, Mary Jaye Debari and Michelle M. Perez-Sotolongo, of McEwan, Martinez & Dukes, P.A., Orlando, for Appellee.
SHARP, W., J.
Mary Somerville, the Personal Representative of her deceased husband's (Richard Somerville's) estate, appeals from a final judgment, after a jury trial, which denied her any damages in a medical malpractice case filed pursuant to sections 768.16-768.27, Florida Statutes. Mary sought to prove at trial that Doctor Ahuja deviated from the standard of care owed by practitioners in his field by failing to properly treat Richard's heart problems, by not ordering more testing prior to discharging him from the hospital, and by not prescribing additional cardiac medication upon discharging him.
Although there were other defendants involved, this appeal relates only to Dr. Ahuja, a cardiologist, who was called in for a consult on August 8, 2000 when Richard was admitted to Fish Memorial Hospital, complaining of rib cage pain. Tests revealed Richard had severe cardiac problems, and a cardiac surgeon recommended coronary by-pass surgery. Dr. Ahuja made the decision to discharge Richard from the hospital because he thought Richard was stable, and could gain strength resting at home, while awaiting the surgery. Unfortunately Richard suffered a fatal heart attack about 13 hours after being discharged.
The sole issue on appeal in this case is whether or not the appellant was denied a fair trial because the judge denied her four juror challenges for cause. Four prospective jurors answered questions during the voir dire, which appellant argues, demonstrated their lack of ability to be unbiased and without prejudice in deciding this case: Love (juror no. 4); Garner (juror no. 15); Beckwith (juror no. 12); and Walls (juror no. 17). The appellant exhausted her peremptory challenges against Love, Garner, and Beckwith, and after being denied an additional peremptory challenge, was forced to accept Walls, over protest, as a juror. We reverse for a new trial.
The issue of failing to excuse a juror for cause was preserved. Florida case law establishes that it is reversible error to require a party to exhaust all of that party's peremptory challenges against prospective jurors who should have been excused for cause, and thereby force that party to accept on the jury a person the party identifies and states they would have exercised a peremptory strike against, had they been granted an additional peremptory strike, or had they had an additional *933 strike remaining.[1] Although appellant's trial counsel did in fact ask for an additional preemptory strike to remove Walls from the jury, that is not a requirement to preserve the issue.[2] We will discuss each prospective juror, including Walls, separately.

Prospective Juror Love.
One of the difficulties in picking this jury was the number of persons on the venire panels who harbored bad feelings about malpractice suits against doctors. They were concerned about the number of such suits, the potential problems which could make it difficult for them to find a doctor to treat them and their families, and the rising insurance costs for doctors, which they thought were caused by malpractice lawsuits.
Love responded that her uncle is a physician, and he had talked to her about rising insurance costs caused by too many malpractice lawsuits against doctors. Appellant's counsel asked her if she would have a problem bringing back a verdict against a health care provider, because of the cumulative effects of such lawsuits, and her ability to get good medical care. She replied, "I guess so, but Ibut I still think that I could separate that fromonce I heard the ... [evidence]." When appellant's counsel pressed her on whether or not she could assure him she would not let her preference play any role in her decision, she continued to vacillate by prefacing her responses "I think ...".
She confessed to having a lingering prejudice in favor of the defendant doctor, expressed as a "tiny bit." When asked what she based the "tiny bit" on she said "I don't know. I don't really know what its based on. I guess just a feeling. I would try not to."
When appellant's counsel asked the judge to excuse her for cause, the judge said: "Because you got one juror more honest than the other ones, you got to kick her off?"
Appellant's counsel continued to question Love. She admitted to having had a recent conversation with a friend who is in medical school, that also influenced her against medical malpractice suits. When asked if those feelings would remain with her during the trial she replied, "I guess they would probably stay with me."
When asked by appellant's counsel if there was a realistic chance that her preference for an outcome in favor of the doctor in this case could have an influence on her watching the evidence, she replied "I don't think so. I don't believe so."

Prospective Juror Garner
Garner also responded affirmatively to appellant's counsel's general questions of whether he harbored prejudice against medical malpractice suits, because of their cumulative adverse affect on doctors, and his ability to obtain good medical care for himself. When asked if it would be his preference in this case to bring back a verdict for the defense, he answered, "Yes and no. Sometimes it's pretty difficult. I don't believeno, no." But he concluded, "Yeah, I probably would. I'm thinking."
The trial court refused to excuse Garner for cause, explaining "I'm telling you, you could probably get anybody on that jury to *934 say that." Appellant's counsel pointed out that Garner had said he "probably" would have a preference for a defense verdict. The court responded "I don't think that gets it." The court also commented to appellant's counsel: "So you got a good appeal ..."

Prospective Juror Beckwith
This juror, as well as Walls, responded affirmatively to appellant's counsel's questions about whether they would be more inclined to bring back a defense verdict if they knew that the cardiology patient had been a smoker for a long period of time. In this case, Richard had smoked cigarettes over forty years, had been advised by his doctors to give up smoking, and smoking had contributed to his cardiac problems.
Beckwith said she would have more difficulties in finding fault on the doctor's part, than had the patient's heart condition been unrelated to smoking. She said, "I think it's a situation that would come into play, yes. Without any other circumstances, I would have to say yes. I think it would come into play."
When asked again by appellant's counsel whether she would be less inclined to hold the doctor responsible "regardless of the evidence, with a smoker that ended up with a cardiologist than a nonsmoker, if say for heredity?" She replied, "Yeah, I guess I'd have to say that, without knowing any other circumstances."
When Appellant's counsel moved to excuse her for cause because she said she would hold plaintiff's proofs to a higher standard because the patient was a smoker, the Court said "I didn't see that." The Court also said "Everybody out there would have said the same thing."
However, the Court asked Beckwith whether she thought the standard of responsibility would be different for a doctor, depending on whether or not the patient smokes. She replied, "not the doctor's responsibility, no." When asked about whether she thought the standard of care for a doctor is different, depending on whether or not the patient smokes, she said she did not understand the question.
The Court rephrased the question: "Well, lets use the word responsibility then. Do you think a doctor's responsibility to his patient to provide competent services is different depending on whether the patient smokes or doesn't smoke?"
Beckwith replied, "No."

Juror Walls
Juror Walls admitted he shared Beckwith's bias against smokers. He raised his hand in response to appellant's counsel's general questions concerning prejudice against smokers who suffer cardiac problems. In the case of Walls, he was not questioned beyond eliciting the fact that he shared Beckwith's views about smokers, and that he understood the questions posed to her.
When appellant's counsel sought to strike him for cause, the court denied his motion. Counsel's request for an additional peremptory strike in order to remove Walls from the jury panel, was denied, and counsel ultimately objected "for the record" to Walls serving on the jury.
The record of the voir dire in this case establishes that the trial judge was concerned that it was taking too much time to pick a jury, and that he was determined to pick a jury before the end of the day. A large number of prospective jurors were excused for cause, and in fact two jury panels had to be called before a final jury was selected. Some were excused because, like Love and Garner, they admitted to negative opinions about lawsuits brought against health care givers, and they were not certain they could set those *935 opinions aside. Others were accepted by both sides when they unequivocally stated they could set aside any prejudices and biases. However due to the rush to pick the jury, the court apparently forgot what some of the challenged jurors had said, and it refused to have the court reporter read back some of the voir dire.
The right to have a case decided by an impartial jury has been equated to the constitutional right to a fair trial.[3] Use of peremptory challenges and challenges for cause are two of the tools afforded parties and judges, in the context of a jury trial, to obtain a fair and impartial panel of jurors.[4] The ultimate test is whether a juror can lay aside any bias or prejudice and render a verdict solely upon the evidence presented and the instructions on the law given by the court.[5] A juror should be able to set aside any bias or prejudice and assure the court and the parties that they can render an impartial verdict based on the evidence submitted and the law announced by the court.
There are a number of court rulings which pull in opposite directions. First, in order to reverse in such a case, the appellate court must find the trial judge abused his or her discretion in refusing to excuse a potential juror for cause, which appellate courts are reluctant to do.[6] Trial judges are present in the court room and have the best vantage point to determine the impartiality of a juror.[7]
Second, Florida appellate courts, as well as Florida Rule Civil Procedure 1.431(c)(1), require that a juror should not serve if he or she is not "indifferent to the action" and should be excused if there is a reasonable doubt as to the juror's ability to render an impartial verdict.[8] If it is a close call, the juror should be excused.[9] Potential jurors' responses to questions by the court or counsel in an effort to rehabilitate him or her, after having admitted to harboring some bias or prejudice, that they can set aside those prior admitted feelings is not determinative. And it is not sufficient if their responses are vacillating or couched with "I think" or "I would try."[10]

*936 Prospective Juror Love
In the case of potential juror Love, she admitted to prejudices and biases against plaintiffs bringing medical malpractice cases. Later in her voir dire she denied that those feelings could have an influence on her. But, her responses were "I don't think so" and "I don't believe so." Her testimony can be summarized by saying she was not one-hundred percent sure her bias' would not affect her verdict but she would try. Her answers were too equivocal and vacillating to over-come her earlier, frank admission of prejudice against medical malpractice suits. She should have been excused for cause.[11]

Prospective Juror Garner
In the case of Garner, his responses demonstrate he harbored prejudices against plaintiffs in medical malpractice cases more emphatically than Love. He said "Yes I do absolutely." And when asked if he thought his preference not to add to the problem of too many malpractice cases would affect his decision, he responded, "Yeah, probably would. I'm thinking." On balance, Garner admitted his bias against medical malpractice suits would affect his ability to render an impartial verdict. He never wavered or vacillated. He also should have been excused for cause.[12]

Juror Beckwith
Beckwith is a closer case. She first admitted harboring prejudices against plaintiffs suing cardiologist, if they were smokers, and smoking was a partial cause of their heart condition. She said it was a factor that "would come into play." Later, after the question was clarified for her, she denied that she would hold the doctor to a lesser standard of responsibility or care for a smoker. It is not clear from the record whether or not Beckwith had a bias prejudicial to Mary in this case. Because of the abuse of discretion standard, failure to excuse her for cause was not error.[13]

Juror Walls
Likewise we think that the questioning of Walls was so limited, appellant failed to demonstrate that any bias or prejudice against smokers he admitted to, could not be set aside, and that he could not render an impartial verdict. Thus, we would not reverse this case based on the failure to excuse him for cause.
Indications in the record demonstrate that the trial judge in this case was rushing to pick a jury, and as a result did not accurately recall what Love and Garner, in particular, said on voir dire, nor did the court allow the court reporter to read back their testimony. At one point the judge told appellant's counsel: "Do not bring me any stuff." Many potential jurors were struck for cause, who expressed almost *937 identical prejudices and inabilities to deal with a medical malpractice case. The trial judge was obviously frustrated with having to bring in a second panel of jurors. At one point the judge said: "Are we going to get a jury today?" "I'm going to go until 7:00 tonight if we have to. I'm going to pick the jury today."
We understand how this could happen, but nevertheless conclude error occurred regarding two of the potential jurors. This deprived Mary of the needed peremptory challenge to excuse Walls, an "objectionable" juror in appellant counsel's view. Because we find both prejudice and error have been established,[14] we reverse and remand for a new trial.
REVERSED and REMANDED for New Trial.
GRIFFIN, J., concurs.
PLEUS, J., dissents with opinion.
PLEUS, J., dissents.
I respectfully dissent. The trial court applied the correct legal rule and properly exercised its broad discretion in rejecting the plaintiff's challenges for cause to potential jurors Love and Garner, neither of whom served on the jury.
The trial judge is in the best position to evaluate a juror's responses during voir dire. The well-settled test for a challenge for cause is not whether the potential juror expresses some bias. Realistically, nearly all jurors have a certain quantum of bias. A general, abstract bias will not disqualify a juror unless it appears that the bias cannot be set aside and the case decided on the basis of the evidence and instructions presented at trial. The trial judge makes the call.
It is a dangerous practice for appellate courts to reverse a trial court's decision based on a cold record. Our Supreme Court, in Kearse v. State, 770 So.2d 1119 (Fla.2000), observed:
In reviewing a claim of error such as this, we have recognized that the trial court has a unique vantage point in the determination of juror bias. The trial court is able to see the jurors' voir dire responses and make observations which simply cannot be discerned from an appellate record.
Kearse, supra citing Smith v. State, 699 So.2d 629, 635-36 (Fla.1997).
This principle applies particularly to Love who repeatedly stated she was confident she could return a verdict based on the evidence. Just as significant is the misapplication of the law to this case. The exchange as to Garner relied upon for awarding a new trial is as follows:
[PLAINTIFF'S COUNSEL MITNIK]:
First of all, let me ask you, by a showing of hands, how many of you feel that there is a problem with too many lawsuits against the health care profession and it could potentially create a situation that would make it difficult, for example, for you to get a doctor or for yourfor yourself or your family?
How may people on the front row feel that way? First of all, do you follow my question? How many feel that there isthere are too many suits against the health care profession? It could potentially create a problem where you can't get a good doctor or you think it's a troubling situation?
....
We've got Ms. Love....
We have Ms. Adams and we have Mr. Garner. Anyone else?
....

*938 Let me asklet me ask you, Mr. Garner, because of that feeling, is part of your feeling that there's a cumulative effect of the suits, without really regard for some of them may be valid, some may not be valid, but there's a cumulative effect that's adverse in your mind of the total number?
[MR. GARNER]: Yes, I do, absolutely.
[MITNIK]: Because of that, would your preference be in this case, if you were to sit as a juror, that the evidence come out in such a way that you, in good conscience, could bring back a verdict for the defense so as not to add to that cumulative effect of stacking one more onto it? Is that a preference of yours, without hearing any of the evidence?

I'm not talking about what you do once you hear the evidence. As you sit here, if you had a choice, would your choice be, I'd rather have a defense verdict and not add to this problem that I believe exists, from a cumulative nature?
[MR. GARNER]: Yeah, I probably would. I'm thinking.
[MITNIK]: By youby you thinking through it and going past kind of the knee jerk reaction,
[MR. GARNER]: Right.
[MITNIK]: in thinking through it and being candid with me like that, it's [sic] shows that you're taking this process seriously and I appreciate it.
(Emphasis added).
Not only is this exchange somewhat ambiguous, more importantly, as the trial court correctly observed, the plaintiff, in seeking to establish cause, failed to "lock it up" by asking Garner whether he could lay aside any bias or prejudice and render a verdict solely upon the evidence and instructions on the law. And that, as the majority itself recognizes, is the test. The question asked by the plaintiff's counsel expressly instructed Garner not to consider "what you do once you hear the evidence." There is simply no basis whatsoever in the record for the conclusion that Garner could not render an impartial verdictthat was the critical question and it was never asked. At most, the plaintiff showed a general bias on Garner's part about a particular class of litigation which, in itself, does not warrant disqualification. See Fazzolari v. West Palm Beach, 608 So.2d 927 (Fla. 4th DCA 1992), disapproved on other grounds, Auto-Owners Ins. Co. v. Tompkins, 651 So.2d 89 (Fla. 1995) (ruling that jurors who had negative feelings about personal injury law suits were not required to be excused for cause where they could set aside such findings).
In sum, the majority announces the correct legal rule but then proceeds to misapply it to this case. In doing so, the majority opinion conflicts with Florida decisional law dealing with the standard applicable to challenges for cause. The plaintiff is not entitled to another trial and the final judgment should be affirmed.
NOTES
[1] See Busby v. State, 894 So.2d 88 (Fla.2004); Kearse v. State, 770 So.2d 1119 (Fla.2000); Hill v. State, 477 So.2d 553 (Fla.1985); Singer v. State, 109 So.2d 7 (Fla.1959); Trotter v. State, 576 So.2d 691 (Fla.1990); Gootee v. Clevinger, 778 So.2d 1005 (Fla. 5th DCA 2000); Longshore v. Fronrath Chevrolet, Inc., 527 So.2d 922 (Fla. 4th DCA 1988).
[2] See Busby v. State, 894 So.2d 88 (Fla.2004); Trotter v. State, 576 So.2d 691 (Fla.1990).
[3] See Singer v. State, 109 So.2d 7 (Fla.1959); Williams v. State, 638 So.2d 976 (Fla. 4th DCA 1994); Club West, Inc. v. Tropigas of Florida, Inc., 514 So.2d 426 (Fla. 3d DCA 1987); Sikes v. Seaboard Coast Line R. Co., 487 So.2d 1118 (Fla. 1st DCA 1986); Leon v. State, 396 So.2d 203 (Fla. 3d DCA 1981).
[4] See Busby v. State, 894 So.2d 88 (Fla.2004); Williams v. State, 638 So.2d 976 (Fla. 4th DCA 1994).
[5] See Lusk v. State, 446 So.2d 1038 (Fla. 1984); Singer v. State, 109 So.2d 7 (Fla.1959).
[6] See Overton v. State, 801 So.2d 877 (Fla. 2001); Kearse v. State, 770 So.2d 1119 (Fla. 2000); Durocher v. State, 596 So.2d 997 (Fla. 1992).
[7] See Busby v. State, 894 So.2d 88 (Fla.2004); Franqui v. State, 804 So.2d 1185 (Fla.2001); Fernandez v. State, 730 So.2d 277 (Fla.1999); Smith v. State, 699 So.2d 629 (Fla.1997); Fazzolari v. City of West Palm Beach, 608 So.2d 927 (Fla. 4th DCA 1992).
[8] See Hill v. State, 477 So.2d 553 (Fla.1985); Darr v. State, 817 So.2d 1093 (Fla. 2d DCA 2002); Bryant v. State, 656 So.2d 426 (Fla. 1995).
[9] See Sikes v. Seaboard Coast Line R. Co., 487 So.2d 1118 (Fla. 1st DCA 1986); Longshore v. Fronrath Chevrolet, Inc., 527 So.2d 922 (Fla. 4th DCA 1988); Club West, Inc. v. Tropigas of Florida, Inc., 514 So.2d 426 (Fla. 3d DCA 1987); Sydleman v. Benson, 463 So.2d 533 (Fla. 4th DCA 1985).
[10] See Franqui v. State, 804 So.2d 1185 (Fla. 2001); Singer v. State, 109 So.2d 7 (Fla.1959); Nash v. General Motors Corp., 734 So.2d 437 (Fla. 3d DCA 1999); Sikes v. Seaboard Coast Line R. Co., 487 So.2d 1118 (Fla. 1st DCA 1986); Leon v. State, 396 So.2d 203 (Fla. 3d DCA 1981).
[11] See Bell v. Greissman, 902 So.2d 884, 2005 WL 906266 (Fla. 4th DCA Apr. 20, 2005); Busby v. State, 894 So.2d 88 (Fla.2004); Overton v. State, 801 So.2d 877 (Fla.2001); Gootee v. Clevinger, 778 So.2d 1005 (Fla. 5th DCA 2000); Nash v. General Motors Corp., 734 So.2d 437 (Fla. 3d DCA 1999); Williams v. State, 638 So.2d 976 (Fla. 4th DCA 1994); Ortiz v. State, 543 So.2d 377 (Fla. 3d DCA 1989); Price v. State, 538 So.2d 486 (Fla. 3d DCA 1989); Longshore v. Fronrath Chevrolet, Inc., 527 So.2d 922 (Fla. 4th DCA 1988); Club West, Inc. v. Tropigas of Florida, Inc., 514 So.2d 426 (Fla. 3d DCA 1987); Plair v. State, 453 So.2d 917 (Fla. 1st DCA 1984);
[12] See James v. State, 736 So.2d 1260 (Fla. 4th DCA 1999); City of Live Oak v. Townsend, 567 So.2d 926 (Fla. 1st DCA 1990).
[13] See Kearse v. State, 770 So.2d 1119 (Fla. 2000); Durocher v. State, 596 So.2d 997 (Fla. 1992).
[14] See Busby v. State, 894 So.2d 88 (Fla.2004).