DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**GUILLERMO CUEVAS,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-266

[January 6, 2021]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Barbara R. Duffy, Judge; L.T. Case No. 15-5235CF10A.

Carey Haughwout, Public Defender, and Nancy Jack, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Anesha Worthy, Assistant Attorney General, West Palm Beach, for appellee.

MAY, J.

The defendant appeals his conviction and sentence on three counts of sexual battery upon a person less than 12 years of age and three counts of lewd or lascivious molestation and the consequent sentence. He raises multiple issues. We affirm, but write to address his argument that the trial court erred in admitting a pastor and church volunteer's testimony because it violated the clergy communications privilege.

- ### *The Crimes and Aftermath*

The details of the crimes are unnecessary to our discussion and so only a summary is provided here. The defendant married the victim's mother when the victim was six. The victim and defendant were very close. When the victim was seven, she began to give massages to the defendant. This turned into unlawful touching and ultimately led to sexual intercourse by age nine.

The victim did not tell her mother because she trusted the defendant

and did not know it was wrong. The defendant began to tell the victim that what they were doing was not right. The sexual abuse would stop for a few weeks and then start up again. The victim began to feel guilty about what was happening, but the defendant instructed her not to tell anyone. He told her that he would be sent away or something bad would happen if her mother found out.

The mother noticed the victim was depressed when she was eleven. When the mother attempted to talk to the victim about her depression, the victim insisted she was just stressed from schoolwork. The defendant offered to talk to the victim. That weekend, he took her to get ice cream and then bought her a pregnancy test. When the mother found out about the pregnancy test, the defendant told her the victim was depressed because she thought she was pregnant.

The mother was pregnant at the time with the defendant's baby. A few days before the mother's scheduled delivery, she saw the victim come out of the bathroom crying. The mother followed the victim into her room, begging her to tell her what was bothering her.

The mother asked the victim if someone had touched her. The victim admitted that someone had touched her, but denied it was someone at school. The mother asked the victim if the defendant did "something," to which the victim nodded yes and told her mother the defendant was having sex with her. The victim asked her mother not to call the police.

The mother confronted the defendant that night. They went on a walk where he admitted having sex with the victim. He told the mother that the victim had approached him, but didn't want to tell the mother about the victim's behavior because she saw him as a "good friend" and he didn't want to disappoint her.

The defendant then went inside the house and called his pastor. Although the mother was not present during the call, the defendant told her that he "told [the pastor] everything," and the pastor told him: "I should wait until you go to the hospital, make sure you are okay, make sure the baby is okay and then call the police."

For the next few days, the mother was very upset and ignored calls from her eldest daughter, who was away at school. The defendant attempted to put the mother in contact with his pastor so she could speak with him. When the pastor didn't answer the call, the defendant told the mother that they should go to the church closest to their house and find someone who could help them. The defendant organized a meeting at Dunkin Donuts

with a volunteer from the local church. There, the mother and church volunteer listened as the defendant admitted having sex with the victim.

Later in the week, the defendant approached the mother and victim. He promised everything was going to be okay and that he would stop.

On the day of the mother's scheduled delivery, she called the eldest daughter to tell her what happened. The daughter immediately came home. While she was on her way, the defendant called to explain how things happened and repeated that he "made a mistake." The daughter cut him off and didn't let him speak.

When the daughter arrived, she arranged to pick up the victim and take her to the hospital to visit the mother and baby before returning to the house that evening. The daughter and victim returned to the hospital the following day. While they were there, the mother called her brother to tell him what was going on.[1]

The uncle reported the defendant's actions to the hospital, who in turn called the police. A hospital nurse then took the eldest daughter and the victim into a private room until the authorities arrived. A detective took a statement from the defendant and transported the victim to a sexual assault treatment center, accompanied by the eldest daughter.

At the center, the detective interviewed the victim. The victim told the detective her last sexual contact with the defendant was two weeks ago.

The nurse at the center examined the victim, who told her the defendant had been sexually abusing her since she was six. The victim explained that it started with touching and progressed to intercourse. She explained that although it made her feel connected with him, in the end she did not like it and wanted it to stop. Following the examination, the victim and daughter returned to the hospital and stayed there overnight because the defendant was at the house. The defendant was arrested.

- ***The Evidentiary Hearing***

Prior to trial, the State filed a notice of intent to introduce child hearsay testimony, pursuant to section 90.803(23), Florida Statutes (2018). The trial court held an evidentiary hearing during which the mother, the

---

[1] The mother and eldest daughter's testimony are inconsistent about which day the mother called her brother, but their testimony is consistent about the sequence of events that followed.

detective, and the nurse testified.

The mother testified the victim and defendant were very close. When the victim made her statement, she was crying uncontrollably and did not want to identify the defendant because she didn't want the mother to react. The mother testified she asked only open-ended questions because she didn't want to put too much pressure on the victim.

Both the detective and nurse testified the victim was mature for her age. The nurse testified the victim told her she was six years old when the defendant first began to touch her and that it progressed to "penetration." A video of the detective's interview of the victim was introduced into evidence without objection.

At the conclusion of the hearing, the trial court found all three statements had sufficient indicia of reliability and admitted them. The trial court made required findings regarding each statement and entered a written order.

- ***The Trial***

At trial, the mother testified that the defendant spoke to his pastor and then told her: "I already told him everything. And I said, 'what did he say?' And he say [*sic*] that I should wait until you go to the hospital, make sure you are okay, make sure the baby is okay, and then call the police." The defendant objected to the next question on hearsay grounds. The trial court overruled the objection because the mother testified only to what the defendant told her.

Prior to the testimony of the pastor and church volunteer, the defendant argued their testimony was privileged under the clergy communications privilege. The State responded the issue was waived under section 90.507, Florida Statutes, because the defendant disclosed the contents of his phone conversation with the pastor to the mother and the mother was present during the defendant's conversation with the church volunteer. The State argued the defendant's challenge to the church volunteer's testimony was procedurally waived because he failed to timely object to the mother's prior testimony regarding the contents of their conversation at Dunkin Donuts.

The trial court found there was no privilege. If one existed, the defendant waived it by disclosing the communication with his pastor to the mother and having the mother present at the meeting with the church volunteer. The trial court allowed the witnesses to testify.

The pastor then testified he knew the defendant for several years; the defendant attended his church. When the defendant called the pastor, he sounded perturbed. The pastor testified the defendant told him he had a serious problem in his family, "something horrible," and wanted the pastor to pray so they would find peace in the family. The defendant said he had relations with one of his wife's daughters. He said the girl was about twelve years old and had provoked him.

The pastor could hear the mother listening; she was crying and talking in the background. The defendant told the pastor that he was using another pastor from a church near their home. The pastor advised the defendant to call the authorities.

The church volunteer testified that he worked for a food company and volunteered at the local church for about nine years. He was not an ordained minister or sect therapist. Someone at the church called him and said there was a couple who needed help, but only spoke Spanish. He had never met the couple before; they were not members of the church. They met at a Dunkin Donuts.

The defendant told the church volunteer he had an intimate, sexual relationship with his wife's daughter. He said that it had been happening for five or six weeks. The church volunteer believed the defendant said she was around eleven years old at the time.

The church volunteer testified the defendant said he was sorry and was seeking spiritual help. The church volunteer told them it was a serious offense against God and the child and that they should go to the authorities. The defendant said he was sorry and that he would report it.

- ### *The Verdict and Sentencing*

The jury convicted the defendant of three counts of sexual battery upon a person less than 12 years of age and three counts of lewd or lascivious molestation. The trial court orally sentenced the defendant to life in prison on all counts with a 25-year minimum mandatory on the lewd and lascivious charges. Defense counsel argued that the lewd and lascivious charges did not have typical minimum mandatories. After reviewing the statutes, the court resentenced the defendant to life in prison on each count, noting "this chart is wrong." The trial court entered a written order

5

imposing concurrent life sentences on all counts.[2]

- ***The Appeal***

The defendant argues the trial court erred in admitting the pastor and church volunteer's testimony because it was privileged under the clergy communications privilege and the defendant did not waive his right to invoke the privilege. The State responds the clergy communications privilege does not apply to either conversation. Moreover, the defendant waived his right to invoke the privilege when he told the mother about his conversation with the pastor.

We review a ruling on the clergy communications privilege for an abuse of discretion. *See Fernandez v. State*, 730 So. 2d 277, 282 (Fla. 1999).

Section 90.505(2), Florida Statutes (2018), provides, "[a] person has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication by the person to a member of the clergy in his or her capacity as spiritual adviser." A communication is "'confidential' if made privately for the purpose of seeking spiritual counsel and advice from the member of the clergy in the usual course of his or her practice or discipline and not intended for further disclosure except to other persons present in furtherance of the communication." *Id.* § 90.505(1)(b).

> This statute creates a four-part test to establish the existence of a privilege. First, the communication must be made to a "member of the clergy." Second, the statement must be made for the purpose of seeking spiritual counseling or advice. Third, the information must be received in the usual course of the clergyman's practice or discipline. And fourth, the communication must be made privately and not intended for further disclosure.

*Woodard v. Jupiter Christian Sch., Inc.*, 913 So. 2d 1188, 1191 (Fla. 4th DCA 2005).

---

[2] The defendant moved to correct sentencing errors under Florida Rule of Criminal Procedure 3.800(b)(2), arguing the trial court erred in sentencing him with an incorrect scoresheet that scored capital offenses and included victim injury points for capital offenses. The defendant also argued the life sentences were cruel and unusual. The trial court did not rule on the motion within 60 days, so it was deemed denied.

The person asserting the privilege bears the burden of establishing the existence of each element of the privilege. *See, e.g., S. Bell Tel. Co. v. Deason,* 632 So. 2d 1377, 1383 (Fla. 1994) ("The burden of establishing the attorney-client privilege rests on the party claiming it."). However, "[w]hen communications appear on their face to be privileged, . . . the party seeking disclosure bears the burden of proving that they are not." *First Union Nat'l Bank v. Turney,* 824 So. 2d 172, 183–84 (Fla. 1st DCA 2001).

- *The Pastor's Conversation*

The defendant first challenges the trial court's determination that no privilege attached to his communication with his pastor because the clergy communications privilege provides for disclosure to persons "present in furtherance of the communication." The State responds that the privilege does not apply because the mother was near the defendant during the conversation and the defendant told her about the conversation immediately following it. We agree with the State.

The clergy communication privilege statute provides: "[a] communication between a member of the clergy and a person is 'confidential' if made privately . . . and not intended for further disclosure except to other persons present in furtherance of the communication." § 90.505(1)(b), Fla. Stat.

Here, the conversation with the pastor was not private. The pastor testified he could hear the mother over the phone during the conversation. And, the record reflects the defendant intended the conversation be communicated. *See Nussbaumer v. State,* 882 So. 2d 1067, 1079 (Fla. 2d DCA 2004) ("[A] communication to a member of the clergy is not confidential and not privileged if it is intended to be communicated to others."). Immediately following his conversation, the defendant told the mother the contents of the conversation. *See Bottoson v. State,* 443 So. 2d 962, 965 (Fla. 1983).

Nevertheless, the defendant argues his disclosure to the mother was within the privilege's protections because the mother was "present in furtherance of the communication." § 90.505(1)(b), Fla. Stat. We disagree.

The pastor testified he could hear the mother crying and talking in the background during the call. But the mother testified she was not present when the defendant called the pastor because she was inside her office.

Even if she was present, the defendant did not establish her presence was necessary to the furtherance of the communication. § 90.505, Fla.

Stat., L. Rev. Council Note (1976) ("[C]ommunications made in the presence of third parties *not necessary* to the furtherance of the communication . . . are not privileged.") (emphasis added).

The mother was not a clergyman, nor was she asked to pray with the pastor. Although her daughter was the subject of the conversation, the purpose of the call was to solicit the pastor's prayers for the defendant's family. The pastor did not inquire as to how the mother was feeling or solicit her thoughts on the situation. He did not ask for her version of the events. The mother was therefore not needed for the furtherance of the communication.

In short, the trial court did not err in finding the privilege did not apply. Even if the privilege applied, the defendant waived the privilege by disclosing the communications' contents to the mother. § 90.507, Fla. Stat. (2018) ("A person who has a privilege against the disclosure of a confidential matter or communication waives the privilege if the person, . . . voluntarily discloses . . . any significant part of the matter or communication.").

- *The Church Volunteer's Conversation*

As a preliminary matter, the defendant's argument is waived because he failed to timely object to the mother's testimony describing the conversation at the Dunkin Donuts. The mother testified she was present for the entire conversation with the church volunteer. She testified the defendant told the church volunteer "what he had done" and that "he had sex with [her] daughter." The defendant failed to object during her testimony. He waited to raise the privilege until after the mother's testimony concluded and the contents of his conversation with the church volunteer had been admitted. *State v. Calvert*, 15 So. 3d 946, 948 (Fla. 4th DCA 2009) (quoting *Harrell v. State*, 894 So. 2d 935, 940 (Fla. 2005)) ("To properly preserve an issue for appellate review . . . 'a litigant must make a timely, contemporaneous objection.'").[3]

Even so, the communications privilege does not apply because the record does not establish the defendant reasonably believed the church volunteer was a member of the clergy. Section 90.505 defines a "member

---

[3] The defendant argues he properly preserved the issue by objecting on hearsay grounds. The record reflects the defendant objected to the mother's testimony regarding the defendant's conversation with the *pastor*, not the church volunteer. Even had he, a hearsay objection is not equivalent to a clergy communications privilege objection.

of the clergy" as a "priest, rabbi, practitioner of Christian Science, or minister of any religious organization or denomination usually referred to as a church, or an individual reasonably believed so to be by the person consulting him or her." *Id.* § 90.505(1)(a).

The church volunteer testified he never worked in the local church; he worked for a food company. The defendant did not know the church volunteer because he had never attended the local church. Although the attorneys interchangeably described the church volunteer as a pastor, the defendant never testified that he believed the church volunteer was a pastor or someone in a similar capacity. In fact, he testified on cross-examination that he sought "*some sort* of spiritual help" because the mother was going into a depressive episode and he wanted "*someone*" to provide "family counseling."

But, even if the church volunteer could be considered a clergy member, the communication was not private. *See Fernandez*, 730 So. 2d at 277. The church volunteer, defendant, and mother met at a Dunkin Donuts, a public area. § 90.505, Fla. Stat., L. Rev. Council Note (1976) (commenting that the clergy communications privilege does not protect communications made under circumstances "where confidentiality cannot be expected, *e.g.*, in public facilities or large groups."). And, the mother was present throughout the conversation.

There was no error in the court's admission of the pastor's and church volunteer's testimony. We affirm on this issue and on the remaining issues without further comment.

*Affirmed.*

FORST and KUNTZ, JJ., concur.

*       *       *

**Not final until disposition of timely filed motion for rehearing.**

9